**Jerry Lynn JESSEE, Appellant
(Defendant),**

v.

**The STATE of Wyoming, Appellee
(Plaintiff).**

No. 5524.

Supreme Court of Wyoming.

Jan. 29, 1982.

Rehearing Denied April 7, 1982.
See 643 P.2d 681.

Michael H. Schilling, Appellate Counsel, Wyoming Public Defender Program, Laramie, for appellant (defendant).

Steven F. Freudenthal, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Criminal Division, Allen C. Johnson, Senior Asst. Atty. Gen., and Michael L. Hubbard, Asst. Atty. Gen., (argued), for appellee (plaintiff).

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

The appellant was tried before a jury and found guilty of burglarizing a dwelling[1] and sentenced by the trial judge. The appellant raises as issues:

"Whether the search of the cabin that appellant was occupying violated his rights under the Fourth Amendment to the United States Constitution and Article I, Section 4 of the Wyoming Constitution and whether the evidence obtained pursuant to that search must be suppressed.

"Whether the subsequent seizure of additional evidence was a direct result of the illegal search of Appellant's dwelling and whether the evidence seized is suppressable [sic] as fruits of an illegal search."

We will affirm.

The ensuing narrative is a summary of the trial evidence. Fritz Portschy owned a trailer house on Beaver Creek, located about five miles from Atlantic City in Fremont County. He lived in Riverton and used the trailer house for recreation purposes such as weekends for fishing, hunting and as he testified it was a "home away from home." On November 1, 1980, he and some friends and a son went there to go hunting and discovered that it and some of the out-buildings had been broken into and "ninety-eight percent" of his possessions were gone. Various locks had been broken to gain access. Many of the items, including an electric generator, were introduced into evidence and he was able to identify them. No one had given consent to anyone to use the trailer. The next day he reported the break-in and theft to an officer of the sheriff's office and made up a list of items missing. He also at that time identified the location of his trailer to the officer.

Prior to that incident, on October 18, 1980, a friend of Mr. Portschy had been in the area deer hunting and checked out the trailer and related facilities as he usually did. Everything had been intact.

The deputy sheriff, John Coppock, investigator for the Fremont County Sheriff, who had taken the report from Mr. Portschy, along with another deputy, drove to the location of the trailer in accordance with Mr. Portschy's direction to carry on their investigation. Neither, however, were familiar with the area. They went in the wrong direction at one point and then had to turn around and follow what is known as the Miners Delight Road to a point where they believed Beaver Creek was nearby.

---

1. In violation of § 6–7–201(a)(i), W.S.1977:

"(a) Whoever, intentionally enters, or attempts to enter, any of the following places without the consent of the person in lawful possession and with intent to steal or commit a felony therein may be imprisoned not more than fourteen (14) years:

"(i) Any building or dwelling; or"

Eventually they came to a fence and gate marked "Private Property No Trespassing." It bore the name "Mazet," so they thought they were on the wrong road. Portschy had not advised them that the land upon which his trailer was located belonged to George Mazet, so they took another road.

They came to what appeared to be an old abandoned cabin. A piece of plastic, used to cover a window opening, had broken loose and was blowing in the wind. There was no fence or other barrier around the cabin. They approached the cabin and Coppock looked through the window opening and saw numerous items: pans, pots, silverware, dishes, food, a sheepherders' stove, skillet, a gray five-gallon can and a red two-gallon can. These items attracted their attention because Mr. Portschy had reported items like these as stolen from his trailer. The officers had no idea who the cabin belonged to. The door was flapping in the wind so they went in.

Coppock took pictures of the cabin and its contents. A Bible was in the cabin but he did not photograph it. A photo of the Bible was produced by defense counsel and the witness testified he had seen the Bible previously during an investigation of littering at Willow Creek. It was in appellant's van at that time. The Bible had later been turned into the sheriff's office as a lost item, and he had returned it to appellant. The discovery of the Bible after entry was the first item that connected appellant with the cabin and contents. Coppock confiscated some of the property in the cabin: silverware, a knife, a teaspoon, a tablespoon, a skillet, a gas can, a five-gallon can and a brown trash can, which Portschy later identified as items stolen from his trailer.

On the way back to the sheriff's office, Coppock recognized appellant's vehicle going down the road, stopped and conversed with appellant, and as a result, followed the appellant to a friend's home where he was living. Appellant left his car there and rode with Coppock back to the sheriff's office to talk about the items found in the cabin and the Bible. Before the discussion began, Coppock read to appellant his *Miranda* rights. Appellant indicated he understood them. After Coppock explained his findings, appellant became nervous and wanted to talk to his attorney but, when Coppock pointed to the phone, he could not remember who his attorney was. He was not questioned further, but he did ask if he was going to be arrested. Coppock responded that he did not know, whereupon appellant asked Coppock to give him until the next morning and he would bring in other items, not found. Appellant left.

The next morning, November 3, 1980, Coppock saw appellant's vehicle at a service station in Hudson. When appellant came out, he was asked if he would be coming to the sheriff's office in Lander. Appellant responded in the affirmative and asked to ride with Coppock because he was low on gas and without funds. At the sheriff's office appellant was again given his *Miranda* rights and interviewed, all of which was recorded. The tape was played to the jury. It amounted to a confession of guilt.

Appellant, after the taped interview, gave permission to Coppock to search the cabin and his automobile. After that appellant was arrested and placed in jail. Coppock then returned to the cabin and picked up the other things Portschy had told him were missing. Other items were found in appellant's car, including a bottle of Jack Daniels whiskey and a bottle of Chivas Regal scotch whiskey, which Portschy had reported as stolen. A generator was retrieved through use of a search warrant from the residence of appellant's friend, Longtine, located east of Riverton. At the trial Longtine, in the pawn business part time, testified that appellant had brought him the generator.

Longtine had been, since 1932, acquainted with the Miners Delight cabin occupied part time by appellant. In fact he called one Kenny Cooper, the alleged owner, for permission for appellant to stay in the cabin, which was granted. Appellant had worked for Longtine off and on doing various jobs.

The appellant testified on his own behalf. What here follows, until otherwise noted, is a summary of appellant's testimony. He

explained that Jeff Ellis, about age 19, who was living with him, was the "illegitimate product" of an illicit relationship between his father and a Montana woman and therefore his half-brother. Since the mother was marrying someone else, it appeared better for Jeff to live with appellant, so he had been with him since 1976, when those arrangements were made. They moved to Wyoming in April, 1980. After holding jobs of various sorts he filed with the United States Bureau of Land Management a gold mining claim on Willow Creek.

He was notified by the Bureau of Land Management that his claims were invalid and he had to cease mining and move off the property. He commenced a move into the Miners Delight cabin. After that he was picked up for a probation violation resulting from forgery charges in California and was returned to there by California authorities. Whatever business he had with the authorities there was taken care of and he was allowed to return to Lander. He went to his camp on Willow Creek to move more of his stuff but found that his camp there had been set fire—still smoldering when he arrived. A number of things had been stolen from him. He made a list of missing things, gave it to the sheriff and completed his move into the cabin.

He claimed that a California hunter gave him a game validation tag for killing a deer on his land, thinking he could collect a landowner's fee on it from the Game and Fish Commission. The gift was out of gratitude for help he had given the hunting party.

He left the cabin on October 23 to go down and do some work for Longtine, fixing fence and other things and returned to the cabin. He claimed he had given the sheriff's office a map of how to get there. When he arrived, there were a lot of things in the cabin someone had put there including an electric generator—it was "kind of like Christmas morning when you are expecting Santa Claus." All the various things in evidence were there. He found a note under a coffee cup which said:

"Thanks for the guided tour, don't dig too much gold or Uncle Sam will gig you and take fifty percent. Send us your address so we can get in touch. The California Bunch, Bob, Richard, and Ernie."

He figured the "California Bunch" had left it for him along with some bottles of liquor (the same purportedly stolen from the Portschy cabin.) He did not want to leave the generator in the cabin for fear someone would steal it, so he left it with Longtine.

His claim is that he denied to the sheriff's deputy any guilt when interrogated, until he was advised that Jeff Ellis was also to be arrested and charged. Coppock let him go but appellant was picked up in Hudson and told that Jeff Ellis had been arrested for the burglary. Coppock also said he wanted to know of the illegal activities of Frank Longtine, suspected of dealing in hot equipment, hot firearms, whatever. Appellant denied any knowledge. Appellant also was promised if appellant confessed that Jeff Ellis would not be charged, appellant would not be charged with being an habitual criminal and Coppock would recommend probation. He gave the statement because he had a twenty-year criminal record did not want to see the young boy Ellis go to prison; so, he confessed to protect Jeff Ellis. This ended appellant's testimony.

In rebuttal, Jeff Ellis' mother testified that appellant was not his half brother, nor had she ever met appellant or his father. The hunter from California testified that he had left the note and when he last saw the cabin there were a lot of things there not present the first time and after appellant had taken his party past the Portschy trailer while hunting. He admitted giving the landowner's deer tag to appellant and said the deer had been shot about two and a half miles away from the cabin.

The following testimony was elicited at the suppression hearing held about two months prior to trial. The hearing was held with the appellant taking two positions— first that there was an unconstitutional search of the cabin; and second that appellant's confession was not voluntary but coerced by promises that his relative would

not be prosecuted, though he was, and that he would not be prosecuted as an habitual criminal, which promise was kept. There is no question on appeal with respect to the alleged coercion, though appellant does argue that the search and seizure led to appellant's confession and it was poisoned and inadmissible as a result.

The testimony presented by the State which assumed the burden of establishing a lawful search was substantially that presented at the trial except that there was greater detail laid out as to the area in which the cabin was located and its dilapidated condition. Deputy Coppock testified running into what appeared to be an old abandoned cabin; there were no signs indicating it to be private property, no fences, barricades, or hedges around the property. The cabin looked as though it was about to collapse. Old rusted cans and a bedspring were around the outside of the building. The rickety door was flapping open in the wind and in doing so made a crashing sound. Coppock did not notice a sign on the door which read "Dynamite. Danger. No trespassing." On one of the windows—no glass—there was only a piece of plastic which was torn loose and blowing about. He looked through the window and saw various items similar to what had been taken from the Portschy trailer, took samples and had them identified by Portschy. The inside did not look lived in, though there were various items of food, later identified as stolen from Portschy. The cabin had a dirt floor. It was the impression of the deputy sheriff that the stuff he saw had been stashed there.

They (the deputies) took samples because they were afraid the evidence would be destroyed or moved; it was getting late in the afternoon and the chill factor was getting below zero. Further, the cabin is up in the hills, in a remote area, eight miles from any highway and over forty miles from their headquarters at Lander.

The appellant testified. He claimed that Coppock knew he was going to the Miners Delight cabin because, when he told Coppack of his plans, Coppack had said he could

not live on or work that area because it, "belonged to BLM. It's on the national register," (a historical site). He nevertheless moved into the cabin on October 11, 1980 with what food they had and borrowed utensils. The cabin was at one time Frank Longtine's but sold to a Kenneth Cooper who resides in Nebraska. Afterwards they lived in it briefly and on weekends in order to work another claim belonging to Frank Longtine. He claimed to have permission to use the cabin from Cooper, having talked to him just before the suppression hearing at Frank Longtine's residence. He could use the place for doing the assessment work. Apparently all he got around to doing was putting plastic on the window.

The district judge and counsel, as part of the suppression hearing, went out and viewed the cabin area. The court took three Polaroid pictures, introduced as court's exhibits. Other photos were also introduced at a second session on the suppression. They vividly express better than the testimony the ramshackle condition of the cabin and cabin site.

The trial judge, in rendering his oral decision, first advised that the defendant if he wished could submit the question and issues of unlawful search and seizure to the jury upon proper instructions because any decision would involve a question of fact. It is noted from the instructions that no such instruction was offered by appellant or given.

The trial judge in his opinion denying suppression, rendered from the bench at the close of the hearing, gave thoughtful attention to the law and the facts. He had obviously done his homework on the pertinent leading and controlling cases. By way of fact finding, he noted that it was believable that the law enforcement officers were in the area in connection with a search for the Portschy place when, more by chance than purpose, they came on the cabin, and further, that it was reasonable to nose around the cabin located in an area of historical significance. From the outside there was no distinguishable evidence that the premises were secured, occupied as an

abode, and privacy expected. On the contrary, the appearance was one of abandonment, with the plastic over the window loose and flapping, the door with no lock or latch, open and banging in the wind. Rather than discouraging entry, those conditions invited investigation. The trial court pointed out that officers have an obligation to inquire into what could have been vandalism in progress. The trial court noticed that it was practically conceded that the goods observed were stolen from the Portschy premises but that the discovery was inadvertent and there was no unconstitutional intrusion. Furthermore, the trial judge found that there was present the exigency of a reasonable threat of removal or loss of evidence. It was a cold day with a heavy chill factor and the cabin was in a remote, semi-wild area. The discovery was made in an atmosphere of innocence; the material seized was in plain view. The appellant had not done those minimal things which would give the world notice that expressed any reasonable expectation of privacy, not only from the police but even from the public at large, hunters or any others. The court expressly held that any reasonable person viewing the premises from the outside as an entirety would reasonably conclude that it was abandoned.

## I

■ Appellant's first claim is that the stolen property seized must be suppressed as evidence against appellant in that the search of the cabin violated his rights under the Fourth Amendment to the Constitution of the United States[2] and § 4, Article 1, Wyoming Constitution.[3] The key words in each of these constitutional provisions are "unreasonable searches and seizures." Not all searches and seizures are forbidden, but only those that are unreasonable. Whether searches and seizures are unreasonable depends to some extent at least upon the articles procured and the circumstances under which they are obtained. As to when a search and seizure is reasonable is a judicial question and as a general rule searches not made under a search warrant are unreasonable. *State v. George*, 32 Wyo. 223, 231 P. 683 (1924).[4] The burden is upon the State to establish that a search and seizure is reasonable, in the absence of a search warrant. At the suppression hearing the trial judge recognized this rule and required the State to go forward and carry that responsibility once it was apparent that the initial entry of the cabin was without the benefit of process.

■ Reasonableness of search is not capable of precise definition or any mechanical application. Each case requires a weighing of the need for the particular search in the public interest against the invasion of the personal rights that the search calls for. Courts must probe the scope of the particular intrusion, the manner in which it is carried on, the justification for its initiation, and the place in which it is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447, 481 (1979) and cases there cited.

Many of the judicial utterances on search and seizure have dealt with the subject in a context not related to "[t]he right of the people to be secure in their * * * houses * * *," but rather in connection with

**2.** Fourth Amendment, Constitution of the United States:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

**3.** Section 4, Article 1, Constitution of the State of Wyoming:

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized."

**4.** See also *Neilson v. State*, Wyo., 599 P.2d 1326, 1330 (1979); *Carroll v. United States*, 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543, 39 A.L.R. 790 (1925).

searches of the person, automobiles, packages, suitcases, et cetera.[5]

From early on in the history of the United States, it was the determination of the architects of the Bill of Rights to secure to the American people safeguards from invasions of the home and privacy of citizens. The Fourth Amendment establishes the fundamental principle that "every man's house is his castle." It is one of the most sacred rights of all those secured by the Constitution. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). A home is entitled to special dignity and sanctity, and the proper way to search a home is to obtain a search warrant. *Goddard v. State*, Wyo., 481 P.2d 343 (1971). While Weeks specifically held that Fourth Amendment rights were applicable only to federal officers, the Supreme Court of the United States in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L. R.2d 933, reh. denied 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d 72 (1961), held that the Fourth Amendment right to privacy is enforceable against state officers under the due process clause of the Fourteenth Amendment to the Constitution of the United States.

Reiterating that there is no formula for the determination of reasonableness and that each case must be decided on its own facts and circumstances, in *Ker v. State of California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), it was held that *Mapp v. Ohio*, supra, was not intended to impose on the states any rule different than

> "[t]his Court's long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean [6] application is carried forward when that Amendment's

proscriptions are enforced against the States through the Fourteenth Amendment. * * * " 83 S.Ct. at 1630.

In *Ker*, supra, search of an apartment was held reasonable and recognized that states are not precluded from developing workable rules governing searches and seizures to meet the practical demands of effective criminal investigation and law enforcement, provided they do not violate the constitutional proscription against unreasonable searches and seizures. Reasonableness of a search is in the first instance a substantive determination to be made by the trial court, subject to review.

The theme of workable rules in *Ker* is also found in *State v. George*, supra, where it was said that to say an examination is invalidly made at a place where an officer has a right to be would unreasonably stretch the constitutional provision invoked. "To make persons secure in their property and protect them against the invasion of thieves who have no regard for the rights of others, is just as important, and without it, in fact, our civilization would vanish." 231 P. at 689.

 It has long been settled that objects falling in plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence. *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). The plain-view doctrine is applied when a police officer is not searching for evidence against the accused but nonetheless inadvertently comes across an incriminating object. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). However, plain view

---

**5.** None of the cases here cited to this point have had to do with search of a house: *State v. George*, supra, sheep corral; *Neilson v. State*, supra, automobile; *Carroll v. United States*, supra, automobile; *Bell v. Wolfish*, supra, body cavity. Others cited by and relied upon by the parties are equally not germane *in that respect*, though they do put together applicable language dealing with the vast subject of search and seizure. For example, cases cited by counsel. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), automobile; *Katz v.*

*United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), phone booth.

**6.** Webster explains that "procrustean" is derived from Procrustes, the name of a legendary robber of ancient Greece who forced his victims to fit a certain bed by stretching or lopping off their legs. In modern application it is that which is marked by complete disregard of individual differences or special circumstances and that often arbitrarily, ruthlessly and violently forces conformity to a doctrine.

alone is not enough to justify warrantless seizure of evidence; exigent circumstances must also be present.[7]

In support of the plain-view doctrine, this court has had recent occasion to adopt the federal view and apply it in *McCutcheon v. State*, Wyo., 604 P.2d 537, 540 (1979); and the elements for plain view as an exception to and in lieu of a search warrant requirement were laid out:

(1) The officer's presence must be proper.

(2) The items observed must appear to be possible evidence.

(3) Attention must be paid to the proposition that the doctrine is only applicable to the inadvertent discovery of incriminating evidence.

While the law of search and seizure is a constantly perplexing problem and in shambles,[8] we are satisfied that there is present clear and authoritative precedent disposing of the present appeal without confusion or dispute.

■ The comprehensive array of evidence produced at the suppression hearing held before the trial judge and his perceptive analysis prior to trial discloses the presence of all the necessary facts to support a proper search and seizure without a search warrant.

First, the officers had a right to be where they were. They were on land belonging to the United States of America. As they entered the Miners Delight area, they passed through the gate of a fence where appeared a sign declaring the land to be property of the United States. The cabin is located upon that land. The region is of historical interest in which are located a number of abandoned cabins, relics of early prospecting activity. The public freely traverses the vicinity and pokes around in the ruins and structures left from the early-in-the-century quest for gold. The photos demonstrate the cabin in question to be practically on the verge of collapse; its sod roof sagging with age, greying timber and logs, together with rusty junk lying around, giving every appearance of having been abandoned. The loose and flapping piece of plastic piqued the curiosity of the officers. Their role at this point would be that of patroling law enforcement officers. They had no knowledge of any unlawful activity in this normally uninhabited country. For all they knew, someone could be inside, dead or sick or vandalism taking place. They had as much right to be curious and nose around as the public. They were standing on property of the United States when they peeked through the window opening—there was no glass. The door was swinging in the wind—there was no lock—no latch—no fastening of any sort. Under the circumstances, they had a right to be there.

The view through the window opening showed various items of personal property which gave the appearance of articles which matched the description on the list given them by Mr. Portschy. These items were possible evidence.

The discovery was inadvertent. They were there only because they were looking for Mr. Portschy's trailer and were on the wrong road to reach it, and in a sense lost. They were not looking for the stolen property. It was strictly accidental that they bumped into this find. Their narrative of how they got there is entirely believable. They had no idea of any relationship of the discovered loot to appellant until they found appellant's Bible, which also was in plain sight. There could be no better example of inadvertence—more luck than any conceivable design.

Now, what about the exigencies of the situation? Why could not one of them remain, before ever entering the cabin, and the other return to Lander for a search warrant? They had one vehicle; it was nearing dusk and the chill factor was below

7. See also, annotation, 29 L.Ed.2d 1067, "Search and Seizure: Observation of objects in 'Plain View'—Supreme Court Cases."

8. See a most interesting and informative comment, McClain, "Unreasonable Searches Under the Fourth Amendment: 'The Rule Becomes Curiousier and Curiouser'," XV Land and Water L.Rev. 275 (1980).

zero. They were forty-five miles from Lander in mountainous country. Neither of the officers was equipped or clothed to stand guard while the other returned to town. For both to return would raise the risk that the thief, then unknown, would return and remove the possible evidence. It was a weekend, neither the county prosecuting attorney or a judge would be available except through being sought out, returned to their offices or at least their advice and a judge's signature obtained wherever he might be found. The circumstances were just such that it was impractical to obtain a search warrant and so unnecessary in view of the abandoned appearance of the building. Law officers are not required to go through motions of absurdity. Common sense must have a place in the law. The search and seizure was reasonable.

## II

Our holding on the fact issue is dispositive of appellant's second issue. There was no fruit of a poisonous tree. *Goddard v. State*, supra; *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Affirmed.

THOMAS, Justice, specially concurring.

I agree that Jessee's conviction for burglary should be affirmed. I do not, however, agree with the rationale in the majority opinion which leads to that result. The seizure of evidence from Jessee's cabin should not be upheld on the basis of exigent circumstances. Instead the court should reevaluate the justification for the exclusionary rule and hold that the exclusionary rule is not applicable here.

I have no question that in this instance the law enforcement officers blundered in effecting the seizure of the evidence. I agree with the majority opinion insofar as it concludes that the discovery of the stolen property in this instance was not unlawful. The unlawful conduct occurred when the officers entered the cabin and proceeded to seize the evidence. I am persuaded that the cabin in fact was a residence occupied by Jessee. Even though the subjective belief of the law enforcement officers was contrary to that fact, the law must be applied to a residence. In this instance there was no justification for the warrantless intrusion to seize the evidence. While the majority opinion justifies the search by an application of the plain-view exception to the warrant requirement, I do not find that the analysis there made accounts for the proposition that the constitutional provisions which are applicable here recognize a distinction between searches and warrantless intrusions to effect seizures. See *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 354, 97 S.Ct. 619, 629, 50 L.Ed.2d 530 (1977), on remand 560 F.2d 1011 (10th Cir. 1977), cert. denied 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1977); *Goddard v. State*, Wyo., 481 P.2d 343 (1971). In both the Fourth Amendment to the Constitution of the United States and in Art. 1, § 4 of the Constitution of the State of Wyoming, protection is offered against "unreasonable searches *and* seizures." (Emphasis added.)

In *State v. Chrisman*, 94 Wash.2d 711, 619 P.2d 971 (1980), the court sets forth a very apt analysis of the applicable law in dealing with a situation which is similar. The court there notes that the primary requirement for application of the plain-view exception is "(1) a prior justification for intrusion." *State v. Chrisman*, supra, 619 P.2d at 974. This, in essence, is the primary element for application of the plain-view exception as set forth in *McCutcheon v. State*, Wyo., 604 P.2d 537 (1979), which is stated in the majority opinion as "(1) the officer's presence must be proper." As the Supreme Court of Washington noted, the Supreme Court of the United States has said that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). This concept was reiterated in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371–80, 63 L.Ed.2d 639 (1980). See *Goddard v. State*, supra.

While the majority opinion attempts to articulate exigent circumstances applicable in this instance which justify the intrusion, I do not agree that there were any exigent circumstances that could justify this intrusion. There obviously was no danger to the law enforcement officers. There is no evidence of any consent to enter; they were not in hot pursuit of a fleeing suspect; nor were they engaged in responding to an emergency. *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Vale v. Louisiana,* 399 U.S. 30, 34–35, 90 S.Ct. 1969, 1971–1973, 26 L.Ed.2d 409 (1970); *United States v. Anthon,* 648 F.2d 669, 675 (10th Cir. 1981). The only appropriate exigent circumstance is the one isolated by the majority opinion, and that is the possible destruction of evidence. For an apt discussion of this exception and the manner in which it appropriately is applied, see *Keeter v. Commonwealth,* Va., 278 S.E.2d 841 (1981).

My interpretation of the situations in which this exigent circumstance may be invoked is that there must be present circumstances which manifest a real, as distinguished from a fancied or speculative, possibility that absent the intrusion the evidence may be lost. It would seem that normally this requires the presence of some person who could accomplish the destruction of the evidence or its removal, or probable cause to believe that such a person is present. This factor was not present in this case, nor was there any good basis for any probable cause to believe that such a person was present. The failure of the law enforcement officers to be properly prepared to secure the premises until a search warrant could be obtained does not qualify as an exigent circumstance justifying warrantless seizure of evidence from a residence.

We have said many times, however, that we can affirm the district court on any proper basis, even though the particular legal proposition was not relied upon in making the disposition in the district court.

The basis that I would use for affirming the district court in this case is that the exclusionary rule should not be applied to the evidence obtained from the cabin, and consequently the conviction can be upheld on that basis.

In my judgment the exclusionary rule in part has outlived its legal and social utility. I am constrained to reiterate language that I included in a dissenting opinion in the case of *Rodarte v. City of Riverton,* Wyo., 552 P.2d 1245, 1264 (1976):

" * * * Among the 'blessings of liberty' and our ' * * * liberties,' is the right to be free from the criminal acts of others. * * *

"Courts must examine the issues presented to them in the context of the needs of all the citizens whom they serve. * * * The people of this land suffer more from crime than they ever have before and more than the citizens of any other country of the world. They have an urgent need to be free from the impact of crime in their lives. The wisdom of any judicial decision which has the effect of inhibiting the efforts of those charged with the enforcement of law on behalf of all of us must be questioned. We need to examine critically the recent history of our courts during which the individual sovereignty * * * has been emphasized, and we need to ask whether we are not moving perilously closer to the point at which the rights of all of us, which we hold so dear, are sacrificed in the interest of the protection of each of us. * * * " (Footnotes omitted.)

The time now has come to consider whether the exclusionary rule as articulated in *State v. George,* 32 Wyo. 223, 231 P. 683 (1924), citing *State v. Peterson,* 27 Wyo. 185, 194 P. 342, 13 A.L.R. 1284 (1920), and *Wiggin v. State,* 28 Wyo. 480, 206 P. 373 (1922), should not be re-examined and limited.[1] This court there relied upon authorities from other states and from the federal courts, including *Weeks v. United States,*

---

1. The exclusionary rule has continued to be applicable law in Wyoming. *Smith v. State,* Wyo., 557 P.2d 130 (1976).

232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B, 834, Ann.Cas. 1915C, 1177 (1914). The federal history is, therefore, pertinent to the inquiry.

In *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the Supreme Court of the United States evaluated the justification for the exclusionary rule and substantially focused upon the deterrence of misconduct of law enforcement officials. In addition to the factor of deterrence the Supreme Court there also justified the exclusionary rule in the context of a healthy federalism depending, so the Court said, upon the avoidance of needless conflict between state and federal courts. In addition the Court described a factor identified as the "imperative of judicial integrity."

It should be noted that in more recent decisions the deterrence factor has been emphasized, and the Supreme Court of the United States has begun to indicate that it would not be so prone to invoke the exclusionary rule where a deterrent effect did not appear to be likely to result from such a ruling. *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The approach has been summarized in *United States v. Williams*, 622 F.2d 830, 846 (5th Cir. 1980), cert. denied 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981), as follows:

"Henceforth in this circuit, when evidence is sought to be excluded because of police conduct leading to its discovery, it will be open to the proponent of the evidence to urge that the conduct in question, if mistaken or unauthorized, was yet taken in a reasonable, good-faith belief that it was proper. If the court so finds, it shall not apply the exclusionary rule to the evidence. Neither Markonni's good faith nor its reasonableness are questioned here, and a proper allocation of the

burden of proof on this issue is therefore not squarely presented by the facts of this case. We therefore leave that matter to another day, going no further than to delineate the 'exception' itself explicitly and to recognize that where the proponent establishes it, the evidence should be received if otherwise admissible."

The social conditions which persuade me to conclude that the exclusionary rule no longer should be followed in all instances relate primarily to the pervasiveness of crime in the society of the 1980s. I do not believe that the courts of this land can ignore the encouragement which a blind adherence to the exclusionary rule must afford to the criminal component of our society. Furthermore, I identify in the development of civil actions for deprivation of constitutional rights,[2] and in the legal rules, whether statutory or common law, which have developed to permit suits against police officers a more effective deterrent than the exclusionary rule. Indeed I sometimes suspect that the exclusionary rule is no deterrent at all, but instead the law enforcement officers justify the loss of the case by pointing to judicial, rather than investigative, shortcomings.

While I do not denigrate the desirability of federal-state cooperation, I am not prepared to subscribe to the theory that a healthy federalism, as outlined in *Elkins v. United States*, supra, depending upon the avoidance of needless conflict between state and federal courts is necessarily a valid justification for the exclusionary rule. If the factor is applicable at all in state courts, it does not seem likely to me in this time that there would be much evidence unlawfully obtained by federal officers and presented on a silver platter to state officers for use in state prosecutions. The inhibitive factors upon such conduct by federal law enforcement officers make that almost an impossibility.

As for the imperative of judicial integrity, I am satisfied that the same factors that

---

**2.** See e.g., *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403

U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

present a more effective deterrent to misconduct in the form of civil relief also satisfy the imperative of judicial integrity. The fabric of American jurisprudence now permits a solution in which the wrongdoer does not go free, but the law enforcement officer who invades a constitutional right of any individual is not likely to escape the consequences of his conduct. In fact, the civil remedies present a solution to an innocent person who would not otherwise enjoy a remedy under the exclusionary rule even though his constitutional rights may have been rather grievously invaded. In every instance the civil remedy adequately meets the wrong done to a person who is charged with a crime. The imperative of judicial integrity is better satisfied by the structuring of a civil remedy for invasion of constitutional rights than it is by the exclusionary rule.

I would, therefore, conclude that the exclusionary rule should only apply to those situations in which there was an intentional invasion of the Fourth Amendment rights of an accused person and there existed no reasonable good-faith belief by the law enforcement officer that the invasion was proper. In those instances in which there did exist a reasonable and good-faith belief that the invasion of the rights of the accused was proper I would hold that the exclusionary rule should not be invoked because its deterrent effect would be highly questionable. In this particular instance the good faith of the law enforcement officers really is not questioned. Although their belief was erroneous, they believed that they were doing the right thing under the circumstances, and that belief was not unreasonable given those circumstances. I then would permit a civil action against the individual law enforcement officers to adjust the invasion of the constitutional rights.

A civil remedy which is invoked as an instrument of social policy is not new to our system of jurisprudence. The structuring of causes of action for personal injuries caused by defective products is widely assumed to have had a salutary effect upon manufacturing practices. The same salutary effect would occur with respect to law enforcement practices.

As to those situations which are not intentional invasions of constitutional rights conducted in bad faith, but which were based upon a reasonable good-faith belief of the officer that his conduct was proper under the circumstances, the civil action for damages is an adequate remedy. As to those instances in which the misconduct of the officers is intentional and accompanied by bad faith, the exclusionary rule still would pertain as additional protection against the unscrupulous and overzealous. The state should not then complain because it can and should deter its officers from so acting.

I would premise affirmance upon the proposition that the exclusionary rule is not applicable in this instance.

ROSE, Chief Justice, dissenting.

Additional facts need emphasizing in this case—for the comedy relief if nothing else. It is the contention of the sheriff deputies that they did not know where the appellant's cabin was and that they stumbled upon it quite by accident while looking for the trailer of a man by the name of Portschy—this to support a Fourth Amendment inadvertent-discovery contention. The fact is that on the day they entered the cabin, they were—and for some time had been—in possession of a map which told them exactly where the appellant's cabin was located, and not only that, the structure had been described to them as being the only cabin in the area with an adobe roof. This was, in fact, an accurate description. The map and the description of the cabin had previously been given to them by Jessee himself. It is not easy for me to see how—with a straight face—the State of Wyoming can contend that the officers were really looking for Mr. Portschy's *trailer* and, in the process, inadvertently came upon the Jessee *cabin.*

I love it where it is suggested that the deputies were on the appellant's premises in response to their piqued curiosity which was

triggered because the cabin was located on an historical site. The majority find it reasonable to believe that it was this curiosity that caused the officers to "nose around" in this area of historical proportions—and, thus, when they came upon the appellant's cabin, they were really not embarked upon an investigation of Jessee for the Portschy robbery—but instead were into some sort of historical inquiry.

The scenario becomes even more lighthearted, if possible, when we come to the question of whether or not the officers thought the cabin was abandoned. Photographic exhibits show a big "No Trespassing" sign hanging over the front door. Some of the plastic was off of the window and so the officers looked inside. There they saw these kinds of things which (if you are ready for this) suggested to them that the cabin was abandoned:

a bunch of kitchen utensils, pots and pans;

a cabinet in which there was a large amount of dry or concentrated food;

a camp stove;

a red teflon skillet;

a black skillet.

Having seen these things, one deputy testified that he really did not know if anyone was living there.

The officers then entered to "Check the inside of the cabin to make sure no one was there," and there they observed such items as the following which, the reader is supposed to infer, made it all the more likely that the officers believed the cabin to be abandoned:

a bed with a bunch of clothes on it;

a family Bible;

fishing equipment;

food;

coffee pot;

utensils that had recently been used.

Having came upon these additional indicators of abandonment, one of the officers testified that he still had doubts whether anyone was living there even though he went on to say that he recognized a Bible which he found on the table as being the property of the appellant who had—on a prior occasion—told him that this was where he lived.

Given these little peeks at the lighter side of the judicial process—and for other reasons that will become apparent—I find the majority opinion to be erroneous in its application of the facts to the law. I would hold that the initial search of the cabin prejudicially violated appellant's constitutional rights and he should have been granted a new trial.

### Was There a Legitimate Expectation of Privacy?

A review of the present state of the law surrounding a claimed Fourth Amendment violation is necessary because, in my judgment, the majority opinion fails to correctly analyze the prevailing constitutional concepts.

The most recent discussions of constitutional search and seizure law emanating from both the United States Supreme Court and this court emphasize that the underlying question which must be answered is whether the individual challenging the search had a justifiable expectation of privacy in the area searched. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Parkhurst v. State*, Wyo., 628 P.2d 1369 (1981). We said in *Parkhurst* that in order to claim a violation of rights guaranteed by the Fourth Amendment and Art. 1, § 4, of the Wyoming Constitution,[1] the challenging party must be able to show a legitimate expectation of privacy. 628 P.2d at 1374. Therefore, the protections afforded by the exclusionary rule only apply to "unreasonable searches" under the Fourth Amendment or Art. 1, § 4, which searches must be shown to have taken place in an area where a legitimate expectation of privacy has attached.[2]

---

1. For the language of the applicable amendments see nn. 2 and 3 of the majority opinion.

2. See: *Rakas v. Illinois*, supra, *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky*, 448

In order for this appellant to contend successfully that the cabin was illegally searched, he must initially demonstrate a legitimate expectation of privacy in those premises. I read the majority opinion to assume that Jessee at least had an expectation of privacy in the interior of the cabin for the reason that the opinion sanctioned the search on plain-view and exigent-circumstance grounds. If this were not the position of the majority there would be no purpose in discussing plain view and exigent circumstances. This would, of course, be true because these concepts speak to the exception to the exclusionary strictures of search and seizure in those circumstances where it can be shown that the defendant has an expectation of privacy in the premises. I would suggest, however, that, in light of the trial judge's conclusion that no expectation of privacy existed in the appellant's cabin, it is necessary to decide the question.

In determining whether the appellant had an expectation of privacy in the cabin, I refer to the guidelines we adopted in *Parkhurst.* There we said that some of the factors to be considered in determining a person's expectation of privacy include: (1) the precautions taken in order to maintain one's privacy; (2) the likely intent of the drafters of the United States and Wyoming Constitutions; (3) the property rights the claimant possessed in the invaded area; (4) the legitimacy of the individual's possession of or presence in the property which was searched or seized. 628 P.2d at 1374, citing from Comment, 15 Land & Water L.Rev. at 283, fn. 56, and at 295.[3] Applying these guidelines, the record tells us that appellant used the cabin as his partial residence. He had protected the windows with plastic covering and there was a "No Trespassing" sign on the only door to the cabin. The defendant had permission from the owner of the cabin to reside there and it can therefore be said that he was lawfully in possession. Finally, as noted by the majority, it has never been questioned that the

framers of both the United States and Wyoming Constitutions intended to guarantee the sanctity and privacy of an individual home. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Steagald v. United States,* —— U.S. ——, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Also, the United States Supreme Court decision in *Rakas v. Illinois* notes that, by virtue of his right to exclude others an individual will, in all likelihood, have a legitimate expectation of privacy in property he owns or lawfully possesses. *Rakas v. Illinois,* supra, 439 U.S. at 143, n. 12, 99 S.Ct. at 430, n. 12.

With these rules in mind, I would, without hesitation, conclude that the appellant had a justifiable expectation of privacy in the cabin. We held in *Parkhurst* that, under Art. 1, § 4, of the Wyoming Constitution an individual's legitimate presence on the seized property in and of itself established a legitimate expectation of privacy, 628 P.2d at 1374, n. 7. Indeed, in this case the appellant had established his right to use the cabin as well as his right to exclude others from its interior. Even though the trial judge found to the contrary, I conclude that the appearance of abandonment cannot be the pivotal issue upon which a decision here can be rendered. The record shows that it was in fact not abandoned and that the appellant had established the cabin as his residence. I am, therefore, in agreement with what must be the majority's assumption that appellant had a legitimate expectation of privacy in the cabin, and the protections of the Fourth Amendment and Art. 1, § 4, are therefore applicable.

I would make clear, however, that it is my belief that appellant's expectation of privacy is limited to the cabin's interior. This conclusion finds its genesis in the fact that the cabin itself was located on public domain, in an area of historical significance. Thus, although appellant could exclude others from the cabin's interior, he was not possessed of a right to exclude members of the general public or the police from the

---

U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Parkhurst v. State,* supra.

**3.** See: n. 8 of the majority opinion.

surrounding areas. I find support for this judgment in a factually similar case from the State of Hawaii. In *State v. Dias*, 62 Haw. 52, 609 P.2d 637 (1980), the Supreme Court of Hawaii decided that the appellant had a justifiable expectation of privacy in the interior of a home that was illegally located on state property, because the state had acquiesced in the possession of the property by squatters, 609 P.2d at 640. The court held that the fact of possession did not alter the public nature of the surrounding areas and therefore the appellant's expectation of privacy did not extend to the exterior of the building, but this did not preclude an expectation of privacy in the interior. Jessee's claim to his expectation of privacy in the cabin's interior seems even stronger, since the cabin is located on BLM land with government permission. By analogy we can conclude that although appellant had a protectable interest in the cabin he could not lay claim to a legitimate expectation of privacy to the adjacent land and, as compared to the facts in the Hawaii case, Jessee's expectation of privacy in the cabin's interior was greater than that of the Hawaiian appellant because here the cabin was located on BLM land with the Bureau's permission.

### Was the Warrantless Search Justifiable Under Plain View?

As noted previously, the majority opinion upholds the search of the cabin by reason of the plain-view exception to the warrant requirement. The leading case discussing this exception is *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), which the majority note we followed in *McCutcheon v. State*, Wyo., 604 P.2d 537 (1979). *McCutcheon* sets out the three ele-

ments generally required to support a claimed plain view justification.[4] While it is true that the presence of these three elements will sustain a plain-view claim, it is important to note, as the majority opinion does, that in *Coolidge* several limitations on the doctrine's application were identified. See: LaFave, Search and Seizure, Vol. 1, § 2.2, p. 244 (1978). These limitations were pointed up by Justice Stewart in his plurality opinion in *Coolidge*:

> "The limits on the doctrine are implicit in the statement of its rationale. The *first of these is that plain view alone is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'* Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure." [5] (Emphasis added.) 403 U.S. at 468, 91 S.Ct. at 2039.

From this it must be assumed that, absent some prior justification for the intrusion into a constitutionally protected area, a plain-view encounter with incriminating evidence cannot justify a warrantless seizure. As noted by Justice Marshall in *Steagald v. United States*, such justification for warrantless entry can come from a consent to enter, or it can be due to the presence of exigent circumstances. 101 S.Ct. at 1647.

---

**4.** See p. 63 of the majority opinion, 604 P.2d at 540.

**5.** In support of this position Justice Stewart relied on *Taylor v. United States*, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932), and *Steele v. United States*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925).

In *Taylor*, the Court found that even though the prohibition officers smelled the odor of whiskey permeating from the garage and also viewed the cases marked whiskey, they nevertheless did not possess justifiable reasons un-

der the circumstances for entering Taylor's garage without a warrant. 286 U.S. at 6, 52 S.Ct. at 467.

On the other hand, in *Steele*, the Court determined that the officer's observations of the whiskey being unloaded from a truck in front of appellant's warehouse clearly provided them with sufficient probable cause for issuance of the search warrant later obtained.

No circumstances were shown in either instance which would have justified a warrantless entry.

Other justification for the warrantless seizure can also arise when the police are in hot pursuit of a fleeing suspect or engaged in responding to an emergency. *United States v. Anthon*, 648 F.2d 669, 675 (10th Cir. 1981) citing from *Vale v. Louisiana*, 399 U.S. 30, 34–35, 90 S.Ct. 1969, 1971–1973, 26 L.Ed.2d 409 (1970). In the final analysis, the law requires not only that plain view satisfy the prior-intrusion standards (as in *McCutcheon*, supra) but also that any warrantless seizure be justified under one of the above exceptions. In this case, therefore, the actions of the officers must not only have satisfied the prior-intrusion rule of *McCutcheon*, but there must also have been exigent circumstances present to legalize the seizure since none of the other delineated exceptions are applicable.[6]

With the above in mind, I can agree that the majority opinion applies the search of the cabin under the correct standards governing plain-view justifications to the cabin's search. My problems, however, arise because I am simply unable to agree that the facts of this case, as applied to the rules and standards discussed above, warrant any finding except that the initial entry into the cabin was illegal and violative of appellant's constitutional rights.

I take issue with two of the conclusions reached in the majority opinion. First of all, I cannot conclude that the facts support a finding of inadvertence on the part of the police, nor can I agree with the further conclusion that the warrantless entry and subsequent seizure of the evidence was justified by the presence of "exigent circumstances."

In *McCutcheon v. State*, supra, we set out three requirements for justifying the discovery of evidence under the plain-view doctrine, the third of those being that the discovery be inadvertent. 604 P.2d at 540–541.[7] The majority support the conclusion that the officer's discovery was inadvertent. For me, the evidence can lead to but one conclusion—namely, that the officers stopped at this particular cabin, not because their curiosity was piqued by a flapping plastic or an interest in the area's historical attractions, but, rather, with the intent to see if Mr. Jessee was involved in the crime. The evidence leads unerringly to the conclusion that the officers arrived at the cabin site because Jessee furnished them a map and an oral description, showing them the way and describing the adobe-roof feature of the cabin. I also have trouble concluding that the officers, while looking for the Portschy trailer home, just happened to stop at this cabin. Was it that the cabin looked like a trailer? It is also noteworthy that both officers passed up investigating several other cabins in the vicinity, and by sheer coincidence decided to investigate only the one containing the stolen items. In summary, I say that the facts surrounding the officers' investigation of the cabin and its contents cannot support a conclusion that the discovery was inadvertent. I would have held that the claim of plain view did not satisfy this particular requirement of *McCutcheon.*

However, for purposes of discussion only, permit me to assume, arguendo, that the *McCutcheon* inadvertence requirement was complied with. I would, nevertheless, hold that there is insufficient evidence in the record to satisfy the exigent-circumstance requirement for a warrantless intrusion into the interior of the premises.[8]

The majority support their finding of exigent circumstances noting that the officers, upon discovery of the evidence, feared that if it was not seized immediately it might be destroyed. The majority also seek to support their position by pointing out that the

---

6. In *McCutcheon*, supra, there was a consent to the search of the vehicle.

7. The majority say at p. 62:

"The plain-view doctrine is applied when a police officer is not searching for evidence against the accused but nonetheless inadvertently comes across an incriminating object.

*Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)."

8. The majority concede that plain view alone is not enough where there is expectation of privacy and that, in addition, there must be an exigent-circumstance showing which justifies warrantless seizure of evidence.

investigation took place on a Sunday, Lander was some 45 miles away, and the officers were not clothed for the frigid weather in a way which would permit one of them to remain in the vicinity of the cabin while the other went for a warrant. These factors can all be taken into account but I do not believe that, even taken together, they constitute the exigent circumstances contemplated by the case law.

As a general rule, threatened destruction of evidence can be a sufficient exigent circumstance to justify a warrantless intrusion. *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). To justify a warrantless seizure on the basis of destruction of evidence, the perceived danger must be real and apparent. The question is whether there is a real or substantial likelihood that the contraband or known evidence on the premises might be removed or destroyed before a warrant could be obtained. *State v. Dorson*, 62 Haw. 377, 615 P.2d 740 (1980). Courts have held that warrantless entry and seizure was not justified even though individuals were on the premises at the time a plain-view discovery occurred. *State v. Dias*, supra; *State v. Schur*, 217 Kan. 741, 538 P.2d 689 (1975); *Coleman v. Reilly*, 8 Wash.App. 684, 508 P.2d 1035 (1973). The mere fact that the evidence is of a type that is easily removed, hidden or destroyed, does not, in and of itself, constitute an exigent circumstance. *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). The State, therefore, carries a heavy burden when it attempts to justify a warrantless entry on the basis of "exigent circumstance." In this case, the State has not met this burden by any stretch of the imagination. Here the officers testified that no one was in the area when they were there, the cabin was located in a remote area, and the officers' presence were not detected. From these and other facts of record I would conclude that there was no showing that

the threatened destruction of evidence was a real possibility. As stated in *State v. Dorson*, supra:

"The police must be able to point to specific and articulable facts from which it may be determined that the action they took was necessitated by the exigencies of the situation." 615 P.2d at 748.

Thus I would conclude that a search of the record fails to disclose any specific factors which would lend support to the officers' subjective belief that in the time it would have taken to obtain a warrant the evidence would have been removed or destroyed.

Mere inconvenience in procuring a warrant is never enough to justify warrantless seizure. *Johnson v. United States*, supra, 333 U.S. at 15, 68 S.Ct. at 369, *State v. Texeira*, 62 Haw. 44, 609 P.2d 131 (1980). Even though it was a Sunday and the officers were some 45 miles from town, such factors only reflect upon the inconvenience that was attendant upon the business of obtaining a search warrant. Admitting that some difficulty would have hampered the officers' attempts to obtain a warrant, I still cannot conclude that the law justified their warrantless seizure of the items in the cabin.

Once in a while the law likes to make room for what it calls "common sense"[9] but in this case, where the question involves a warrantless intrusion into a man's home, the law, in my view, does not permit the justification for the search and seizure to stem from notions of "common sense" alone. As was eloquently discussed in *Johnson v. United States*, supra:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that

9. What may be "common sense" to you may be the most uncommon sense to me.

evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." 333 U.S. at 13–14, 68 S.Ct. at 369. We must jealously protect the warrant requirement found in our constitutions, and, in doing so, we must, when the facts necessitate a finding that a warrant was needed, exclude all evidence obtained as a result of the unconstitutional, warrantless entry.

I would have held that the officers' entry into the cabin violated appellant's constitutional rights and that the items of evidence seized should have been suppressed. It was clear error not to do so, and I would have reversed.

Lastly, I should say that I am not in agreement with the position of Justice Thomas where he advocates abandoning our historical position with respect to the exclusionary rule. If this court is not careful, we are going to chip away at the Fourth Amendment rights of the American citizen until—one day—they will have disappeared altogether. We must never forget that these rights were forged out of the steel and fire of bitter human experience which warns that, for all of those who may one day need the protecting arms of the criminal justice system (including you and me), there must be ground rules which will protect against the unscrupulous, the overzealous and their wiles. To pretend that these threatening forces have not found and will not find their way into the system is to close our eyes to reality, which we do at the risk of collapsing the greatest criminal justice system the mind of man has ever devised.