Richard Albert ORTEGA, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 83–20.

Supreme Court of Wyoming.

Sept. 28, 1983.

Jay Dee Schaefer, Laramie, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Allen C. Johnson, Sr. Asst. Atty. Gen., Michael L. Hubbard, Asst. Atty. Gen., Cheyenne, for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

BROWN, Justice.

Following the death of his wife, a jury convicted appellant of murder in the second degree as that crime was defined in § 6–4–104, W.S.1977, now § 6–2–104, W.S.1977 (June 1983 replacement). Appellant challenges his conviction on two grounds. First, he contends that unconstitutionally seized evidence was improperly used against him at his trial. Second, he argues that the introduction of a neighbor's testimony concerning a domestic quarrel between appellant and his wife, occurring two months before her death, was prejudicial error.

We affirm.

On the night of August 10, 1982, appellant, along with his wife, Lillian Ortega, and daughters, Robin and Renee, entertained at their home Albany County Deputy Sheriff Ron Franck and his family. At approximately 1:00 a.m., August 11, the Franck family left the Ortega house. Shortly thereafter appellant and his wife began quarreling. Robin Ortega, age 14, heard appellant call his wife "a dumb broad" and order her to get out of bed. Robin then heard a thump and a slapping noise, and soon after a gun shot. Appellant called to Robin and told her he had done a bad thing. She ran into the bedroom and saw her mother's body.

At approximately 1:15 a.m., Ron Franck received a telephone call from appellant. During the conversation, appellant stated that he had shot his wife. Franck told appellant to hang on and that he would be right over.

Sometime around 1:30 a.m. appellant called the Albany County Sheriff's office, and told the dispatcher he had just shot and killed his wife. When appellant was unable to provide directions to his house, Robin gave the directions over the telephone.[1]

Deputy Sheriffs Palmer and Osborn, on routine patrol, were directed to the Ortega residence. Upon arrival, they observed lights on in the house. As they left their patrol car, the deputies saw appellant walk out of the house. They instructed him to walk away from the house with his hands over his head, and then told him to lie on the ground with his head looking away from the deputies. After he was lying down with his legs and arms spread, Deputy Osborn handcuffed him. He was then assisted to his feet and placed in the patrol car.

Meanwhile Deputy Sheriff (Lieutenant) Adler had arrived on the scene. Once he saw that appellant had been handcuffed, Lieutenant Adler entered the house to check on the welfare of Lillian Ortega. He went upstairs and found appellant's wife lying on the floor of the bedroom. Her

---

1. The parties entered into a stipulation only for the motion in limine seeking suppression of the evidence obtained from the Ortega residence. Although no evidence was introduced at trial to the same effect, according to that stipulation appellant stated to the dispatcher, "I have just shot my wife, get an officer out here."

body had been covered with a bedspread which he lowered from her face to check for any signs of life. Lieutenant Adler concluded that she was dead and then departed from the residence. Outside, he told Deputy Osborn to cancel the call for an ambulance. When Deputy Franck arrived and asked about the children, Lieutenant Adler suggested Deputy Franck look after them until they were needed for questioning.

In the meantime Sheriff Fritzen arrived. Lieutenant Adler went back inside and discussed the situation with the Sheriff, who said that investigating detectives were on their way and that they would "handle the house." Lieutenant Adler, Deputy Palmer, and Deputy Osborn were then instructed to go to the sheriff's office and see what statements they could get from appellant, his children, and Deputy Franck.

At approximately 2:17 a.m., Detectives Bennett and Banks arrived at the Ortega residence. Sheriff Fritzen placed Detective Bennett in charge of a follow-up investigation, which included "photographs, diagramming and locating and taking of evidentiary items." Detective Banks had the task of photographing the scene before anything was moved or disturbed, while Detective Bennett surveyed the scene looking for evidence. Around 2:45 a.m., Detective Hays arrived. He was assigned the job of collecting, preserving, and tagging all the evidence taken from the house.

During the course of the follow-up investigation, numerous items were seized. A shoulder holster and a wet purple washcloth were removed from the bed. Another wet purple washcloth was found lying behind the bed. A blood-soaked tissue was discovered inside a wastepaper basket located next to the bed. Taken from a laundry basket in the bathroom were two wash cloths, two shirts, one pair of blue jeans, and one yellow towel. From a dresser top in the bedroom the officers confiscated a Ruger Blackhawk 41 Magnum single revolver, several .357 Magnum cartridges and a couple boxes of .357 Magnum ammunition. Several "guns" were removed from the bedroom closet and one was taken from

the kitchen table. The police officers also seized a three-by-five portion of the bedroom wall where the bullet had lodged.

The following day Detective Hays sent the clothing and linen taken from the scene, along with blood and hair samples found in the bedroom, to the Wyoming State Crime Laboratory. The Laboratory reported back on September 1, 1982, that the blood removed from the blue jeans and the tissue "was consistent with the known blood from Lillian Ortega." Blood was also found on the towel, the shirt and the washcloths, but in such minute amounts that no blood type could be determined.

Meanwhile, appellant had been charged with the murder of Lillian Ortega. On September 2, 1982, a preliminary hearing was held and appellant was bound over to the district court for trial.

On October 29, 1982, appellant made several motions in limine. One of these motions asked for the suppression of all evidence seized as a result of the warrantless search of the Ortega residence on August 11, 1982. Another motion sought to bar evidence of appellant's prior misconduct.

On December 8, 1982, the district court conducted a hearing on the motions in limine. At that hearing, it was revealed that the State intended to introduce testimony of a neighbor that, in June of 1982, appellant had knocked Lillian Ortega to the ground and presumably attempted to urinate on her.

The district court ruled on December 13, 1982, that the search of appellant's house and the seizure of evidence were not constitutionally infirm except for the removal of the wall. Thus, all the evidence seized, except for the wall, was admissible at trial. The court also ruled that evidence concerning the June 1982 incident could be introduced at trial.

During the trial which commenced on December 13, 1982, the State offered into evidence the photographs taken on August 11 of the inside of the Ortega residence, a diagram of the Ortegas' bedroom and bathroom, the report of the State Crime Labora-

tory, the Ruger Blackhawk 41 Magnum, four bullets removed from the revolver's chambers, and the blood-soaked tissue. The trial judge granted appellant a continuing objection to the admission of those items seized from his house.

The State also introduced the testimony of appellant's neighbor concerning the June 1982 incident he had witnessed between the Ortegas. Following the testimony, the trial judge, in accord with his order in limine, gave the jury a limiting instruction, informing them the testimony could only be considered "to the extent that you are able to infer from this testimony a motive, malice, preparation or an intent on the part of the Defendant to kill the decedent."

Upon completion of the trial, the jury returned a verdict finding appellant guilty of murder in the second degree. The district court sentenced appellant to 20–25 years in the Wyoming State Penitentiary. From that judgment and sentence, appellant has perfected this appeal.

I

The first issue we address is whether evidence obtained from the Ortega house on the morning of August 11, 1982, was properly admitted at trial. Appellant contends the district court erred in refusing to allow him to invoke the exclusionary rule as the remedy for the alleged violation of his constitutional rights. In order to determine whether he is correct, we must first consider the underlying Fourth Amendment claim.

■ The Fourth Amendment to the United States Constitution and Art. 1, § 4, Constitution of the State of Wyoming prohibit "unreasonable searches and seizures." A search, within the meaning of these provisions, occurs when the government intrudes upon a reasonable expectation of privacy. Unreasonable Searches Under the Fourth Amendment: "the Rule Becomes 'Curiouser and Curiouser,' " 15 Land & Water L.Rev., p. 275 (1980). This court has previously adopted standards for determining when an individual possesses a reasonable expectation of privacy. The factors to

be considered include: 1) the precautions taken to maintain one's privacy; 2) the likely intent of the drafters of the United States and Wyoming Constitutions as to the privacy interest claimed; 3) the claimant's property rights in the invaded area; and 4) the legitimacy of the individual's possession of or presence on the property which was searched or seized. *Parkhurst v. State,* Wyo., 628 P.2d 1369 (1981), cert. denied, 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981).

■ Where the privacy interest is claimed in a home, courts have universally recognized the existence of a reasonable expectation of privacy. *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); and *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). As this court has stated: "A home is entitled to special dignity and sanctity, and the proper way to search a home is to obtain a search warrant." *Jessee v. State,* Wyo., 640 P.2d 56, 62 (1982). Accordingly, since appellant possessed a reasonable expectation of privacy as to his home, the police officers' intrusion into it constituted a search under both the United States and Wyoming Constitutions.

■ Subject to certain exceptions, warrantless searches and seizures are per se unreasonable under both the Fourth Amendment to the United States Constitution, and Art. 1, § 4 of the Wyoming Constitution. *Kish v. State,* Wyo., 642 P.2d 453 (1982). The recognized exceptions include: 1) search of an arrested suspect and the area within his control, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); 2) a search conducted while in hot pursuit of a fleeing suspect, *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); 3) a search and/or seizure to prevent the imminent destruction of evidence, *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); 4) a search and/or seizure of an automobile upon probable cause, *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); 5) a search which results when

an object is inadvertently in the plain view of police officers while they are where they have a right to be, *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), reh. denied, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971); 6) a search and/or seizure conducted pursuant to consent, *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); and 7) a search which results from an entry into a dwelling in order to prevent loss of life or property, *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). The burden rests upon the state to demonstrate that the circumstances of a particular case fit within the parameters of one of these exceptions. *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

In *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Supreme Court was asked to recognize an additional categorical exception to the warrant requirement, which would allow police to make warrantless searches of dwellings which had been the scene of a homicide. There, following a shoot-out in which a police officer was killed in petitioner's apartment, a warrantless search of the premises was conducted over a four-day period. Various items were seized and used against the petitioner at trial. The court, however, disallowed the "murder scene exception" and indicated that a warrantless entry must be justified under one of the previously recognized exigencies.

■ We must determine whether the entry into appellant's home and the subsequent seizure of evidence can be justified under one or more of the recognized exceptions to the warrant requirement. When the police arrived at the Ortega residence on August 11, they arrested appellant outside his home. Only after he had been handcuffed did an officer enter the house. Clearly a search incident to a lawful arrest cannot be used to justify this entry since the area within appellant's immediate control did not include the house. However, as Lieutenant Adler testified, he went inside to check upon the condition of appellant's wife. Though appellant indicated his wife

was dead, it should be clear that police officers are not required to accept a layman's determination of death. Accordingly, the officer's action was proper under the exception allowing intrusion upon an expectation of privacy when necessary to render emergency aid to a person reasonably believed to be in distress and in need of assistance. *Michigan v. Tyler,* supra; and *Wayne v. United States,* 318 F.2d 205, 115 A.D.C. 234 (D.C.Cir.1963). The initial intrusion into the house was proper.

■ Once an intrusion has occurred, police officers may take cognizance of items within plain view. This authorizes them to see what comes within their field of vision while they are where they have a right to be. *Coolidge v. New Hampshire,* supra. Thus, so long as their initial intrusion is justified, the police while within the legitimate scope of their entry may search the premises with their eyes.

■ In this case when Lieutenant Adler legitimately entered the house to check upon the condition of Lillian Ortega, he had the right to search the house to the extent necessary to accomplish his mission. While there, he discovered that she was dead and observed the state of the bedroom in which she had been shot. Such conduct was proper. Lieutenant Adler then departed the residence, but with the knowledge of Lillian Ortega's death, the manner in which she died, and the condition of the room her body was in. Accordingly, there existed probable cause for searching the house for evidence of a crime.

■ Probable cause alone, however, is insufficient to justify an intrusion upon an expectation of privacy. Without a warrant issued by a magistrate upon a showing of probable cause, searches and seizures are per se unreasonable. *Steagald v. United States,* supra. An entry without a warrant must be justified under one of the exceptions listed previously where there has been no finding by a neutral and detached magistrate of the presence of probable cause. *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61

L.Ed.2d 235 (1979). Here then, the re-entry of the Ortega residence must also fit within one of the exceptions to the warrant requirement.

In *Michigan v. Tyler,* supra, the court considered the admissibility of evidence obtained by police and fire officials after warrantless entries onto burned premises. The court not only noted that a warrantless entry into a residence in order to fight a fire was reasonable, but also observed that subsequent entries may be necessary to conduct an immediate investigation in order to preserve evidence from intentional or accidental destruction. *Michigan v. Tyler,* supra. This is consistent with the exception to the warrant requirement recognized in *Cupp v. Murphy,* supra, authorizing searches and seizures where evidence is in imminent danger of being destroyed.

◼ Here the police knew Lillian Ortega's body was inside, and that blood and other body fluids had been splattered throughout the room in which she had been shot. The evanescent quality of blood and body fluids has previously been recognized by the Supreme Court. *Cupp v. Murphy,* supra; and *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Here, the trial court also noted in its decision that the evidentiary value of body fluids diminishes with time. As a result, the reentry by police officers into the Ortega house can be justified under the exception authorizing a warrantless search and seizure in order to preserve evanescent evidence.

◼ By necessity, attendant to the right to seize this type of evidence, there must exist the right to photograph and diagram the scene before the evidence is confiscated. Therefore, we believe no constitutional violation occurred with regard to the photographs taken of the inside of the Ortega residence, nor the diagrams drawn showing the layout of the house. Accordingly, the photographs and diagrams were admissible at trial. Further, since the seizure of the

blood-covered items can be justified, the admission of the crime laboratory report concerning these items was also proper.

Difficulty does arise, however, regarding the admission into evidence of the gun and the bullets found at the Ortega residence. Clearly the gun cannot be said to be in imminent danger of being destroyed. The police had appellant in custody and there was no reason to believe that anyone would attempt to destroy or hide the gun. Further, it should be noted that at the time the gun was seized, the police were not sure it was the murder weapon. Their doubt caused them to seize all other guns found in the house.

◼ Appellee tries to justify the seizure of the gun upon the plain view exception. However, as noted above, the plain view doctrine only legitimates the police officer's observation of an item. As this court has previously stated: "Plain view alone is not enough to justify warrantless seizure of evidence; exigent circumstances must also be present." *Jessee v. State,* supra, at 62–63. This rule grows out of *Coolidge v. New Hampshire,* supra, where the court stated:

"The limits on the doctrine are implicit in the statement of its rationale. The first of these is that plain view *alone* is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure. [Citations.]" 403 U.S. at 468, 91 S.Ct. at 2039, 29 L.Ed.2d at 584.[2]

As one commentator noted:

---

**2.** It should be observed that the opinion of the Court in *Coolidge* was only a plurality opinion;

however, in *Texas v. Brown,* ── U.S. ──, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), five members

"Seeing something in open view does not, of course, dispose, ipso facto, of the problem of crossing constitutionally protected thresholds. Those who thoughtlessly over-apply the plain view doctrine to every situation where there is a visual open view have not yet learned the simple lesson long since mastered by old hands at the burlesque houses, 'You can't touch everything you can see.' " Moylan, The Plain View Doctrine: Unexpected Child of the Great "Search Incident" Geography Battle, 26 Mercer L.Rev. 1047, 1096 (1975).

In other words, plain view may give a police officer the probable cause necessary for a warrant to issue but that by itself is not enough for the seizure of evidence. To justify a warrantless seizure, one of the exigent circumstances which authorizes a warrantless seizure must be in existence.

All the exceptions envision the presence of probable cause before authorizing a seizure, and here the police did not have probable cause to believe the gun was the murder weapon because every gun in the house was seized. It was only later determined that the particular gun admitted at trial was the murder weapon. In cases like this, before seizing everything in sight, the police should determine precisely what it is they want to seize and then obtain a warrant for those items.

Even though the admission of the gun and bullets appears to be error under the Fourth Amendment and Art. 1, § 4, we believe the error was harmless. Before federal constitutional error can be ruled as harmless, we must be able to declare that it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), reh. denied, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); and *Campbell v. State,* Wyo., 589 P.2d 358 (1979).

In this case, the admission of the gun and bullets was cumulative at best; it appears from the record that it served absolutely no purpose. Appellant admitted

shooting his wife. The only question for the jury to decide was appellant's intent at the time. The prosecutor elicited testimony from appellant that the gun was a single action and that it needed to be cocked before it would fire. The prosecutor argued that the extra movement necessary established greater culpability. However, the admission of the gun did not show this; the testimony did. Since all the other evidence used had been properly seized, we conclude that any federal constitutional error in this case was harmless beyond a reasonable doubt.

## II

The second issue appellant raises concerns the admissibility of evidence regarding appellant's prior assault upon his wife. This evidence consisted of testimony from a neighbor that appellant had argued with his wife in appellant's backyard, and he then pushed her down, out of the neighbor's field of vision, and urinated in the direction she had fallen.

Appellant contends that this testimony should not have been allowed into evidence under the Wyoming Rules of Evidence. First, he argues that it does not come within the scope of admissible evidence under Rule 404(b), W.R.E. This rule provides:

"(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

As has previously been said by this court, this rule operates to ban the use of evidence of character in order to establish that behavior on a particular occasion was in conformity therewith; however, such evidence may be admissible for other purposes. *Hopkinson v. State,* Wyo., 632 P.2d 79 (1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). It

of the Court stated their view that *Coolidge* is     the law.

has also been held that under Rule 404(b), supra, deference is given to a trial judge's determination to admit evidence. So long as there exists a legitimate rationale for his decision to admit evidence, we will not substitute our judgment on appeal. *Hopkinson v. State,* supra.

▆▆▆ Rule 404(b), supra, authorizes evidence of prior behavior in order to prove motive. In this case appellant's claim was that the shooting of his wife was a mistake or accident. The testimony from appellant's neighbor undermines such a claim. The act of urinating upon one's own spouse is a deliberate act and is indicative of a complete lack of respect for the spouse as a human being. The testimony provides insight into a person's feelings for another which may help establish motive, a permissible use of prior behavior under Rule 404(b). Accordingly, we cannot disagree with the trial court's determination that the evidence was probative.

The real issue as we see it concerns appellant's claim that the evidence should have been suppressed because its prejudicial effect substantially outweighed its probative value under Rule 403, W.R.E. Rule 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Determinations of admissibility under Rule 403 are also committed to the discretion of the trial judge. His decision will not be reversed on appeal so long as a legitimate basis exists supporting it.

▆▆▆ Conceivably, the testimony may have had an impact on the jury, prejudicial to appellant. However, in light of its probative value we cannot conclude that there was no legitimate basis for the trial court's decision that the prejudicial effect did not

substantially outweigh the probative value. Accordingly, we must affirm.[3]

Affirmed.

THOMAS, Justice, specially concurring.

I am in full accord with the majority of the court as to the ultimate disposition of this case. Richard Albert Ortega did kill his wife, and he did so purposefully and maliciously. He is guilty of second degree murder.

I am not at all comfortable, however, with the patent evasion suggested by the majority opinion of the holding articulated by the Supreme Court of the United States in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). If the evanescent quality of blood and body fluids is a reason not to apply the rule of *Mincey v. Arizona,* supra, then it would seem that a similar search and seizure could occur at every homicide scene. While I confess that I might have decided *Mincey v. Arizona,* supra, somewhat differently than the decision by the Supreme Court of the United States, I would suppose that the oath of judicial office binds me to accepting that rule as the law.

The real difference between this case and *Mincey v. Arizona,* supra, as I would understand the factual situations, is that nobody who lived in the Tucson house invited the police officers to come to that house because of the homicides. Conversely, Richard Albert Ortega, as stipulated for purposes of the suppression hearing in this case, called police authorities and stated to them, "I have just shot my wife, get an officer out here." When Ortega did that, he consented to a search of his home. As to this aspect of the case I would follow the lead of the Supreme Courts of Florida and Louisiana. Both of those courts have held that by reporting a shooting in his home, a person such as Ortega consented to a search of his property for the purpose of investigating the facts and circumstances surrounding the shooting. *Zeigler v. State,*

**3.** We believe the approach, set forth by Justice Thomas in his special concurrence, may also justify an affirmance in this case.

Fla., 402 So.2d 365 (1981), cert. denied 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982); *State v. Dowling*, La., 387 So.2d 1165 (1980). I would not follow the contrary rule adopted by the Illinois Appellate Court in *People v. Annerino*, 97 Ill.App.3d 240, 52 Ill.Dec. 714, 422 N.E.2d 923 (1981). Because the search in my view was a consensual search in accord with *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), there would not have occurred either a search or seizure unreasonable under either the Fourth Amendment to the Constitution of the United States or Art. 1, § 4 of the Constitution of the State of Wyoming. This would be my basis for upholding the admissibility of the evidence in accordance with the ruling of the district court, and of course that ground extends to all of the evidence seized.

I also find the majority opinion to be unduly restrictive with respect to its application of the plain view doctrine. Assuming that the presence of the investigating officers inside Ortega's home was justified, either because of his consent or because of the ground suggested in the majority opinion, then the law enforcement officers are permitted to seize any incriminating evidence or contraband which is in plain view.

> "The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be. * * *" *Washington v. Chrisman*, 455 U.S. 1, 5–6, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982).

In connection with this flat statement the Supreme Court cited *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), reh. denied 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971), and *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

Even more recently the Supreme Court of the United States addressed the question of the seizure of property under the plain view exception in *Texas v. Brown*, —— U.S. ——, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

In this case the Supreme Court first noted that the "plain view" exception to the warrant requirement is best understood not as an independent exception to the warrant clause, but simply as an extension of any prior justification for the officer's access to the object seized. All of the Justices agreed with the holding of the plurality opinion that where the other requirements of the plain view exception were met an officer who had probable cause to associate the seized property with criminal activity is permitted to seize the evidence. In the instant case the application of that principle would depend upon the justification for the presence of the officers in Ortega's house. Assuming that they were properly on the premises then they were entitled to seize all of the evidence found in plain view which they had probable cause to associate with criminal activity.

To round out my position, I state that I am in full accord with respect to the articulation of the holding by the majority opinion on the claimed error with respect to admitting evidence of prior bad acts.

ROSE, Justice, dissenting.

I dissent because I believe that the warrantless search of Richard Ortega's home cannot be justified under any recognized exception to the warrant requirement and because the evidence of the prior bad acts of appellant was improperly admitted and highly prejudicial.

I

In *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), a unanimous Supreme Court refused to recognize a general exception to the warrant requirement which would permit a warrantless search at the scene of a homicide. Under *Mincey*, the need to protect lives and avoid injury justifies the police in making a prompt, warrantless search of the area to determine whether other victims or killers are present. 437 U.S. at 392, 98 S.Ct. at 2413. *No other warrantless search is permitted*, absent a recognized exigency beyond the fact that a killing has occurred.

The need to preserve blood and other body fluids present at the death scene is not the sort of exigency which justifies the warrantless search for and seizure of such evidence. In *Mincey,* blood and other body fluids were present throughout the area, since a shoot-out had resulted in one person dead and three wounded in various rooms of the defendant's apartment. Instead of determining that the evanescent character of these fluids justified their immediate collection, the court found that

" * * * [t]here was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant." 437 U.S. at 394, 98 S.Ct. at 2414.

The facts and holding of *Mincey* compel the conclusion that blood and other body fluids, often associated with homicide, are not subject to a warrantless search and seizure simply on the basis of their evanescent qualities.

The Supreme Court's ruling in *Mincey* is supported by the known chemical characteristics of blood. According to the Wyoming State Crime Laboratory, dried blood is stable for months and produces reliable results when tested to determine type, species specificity and certain enzyme activity. Ironically, when blood-soaked clothing or paper is sealed in a plastic bag for safekeeping, bacterial activity can cause the blood to deteriorate within a short time.

The majority cite *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), in support of their proposition that the need to preserve evanescent evidence justifies the police in making a warrantless search for and seizure of blood and body fluids. Both of those cases, however, were concerned with the warrantless seizure of evidence which was certain to disappear within a short time. In *Schmerber* the Court upheld the warrantless withdrawal of a blood sample from petitioner's body for the purpose of measuring alcohol content. The Court reasoned that the delay necessary to obtain a warrant threatened destruction of the evidence, since the quantity of alcohol in the blood stream begins to diminish once drinking stops.

In *Cupp v. Murphy,* supra, the police, without obtaining consent or a warrant, took scrapings from the fingernails of a suspect in a strangulation case. The suspect was not under arrest at the time and the Court found the limited search to be necessary to preserve the readily destructible evidence under his fingernails.

In the case at bar, the blood and other fluids sought by the police officers were present on clothing, toweling and a tissue inside the defendant's home. All occupants of the house had been removed and the police were in control of the area at the time the search occurred. There was no possibility that the clothes or towels would be laundered, that the blood-soaked items would be destroyed, or that the blood samples would naturally deteriorate before a warrant could be obtained. In short, no exigent circumstances existed which could justify the failure of the investigating officers to obtain a search warrant. Therefore, I would hold that the search in this case was unreasonable and a violation of the state and federal constitutions.

I do not believe that the warrantless intrusion can be upheld on the ground that Mr. Ortega consented to a search of his home by reporting the killing to the sheriff's office. Shortly after the shooting, the appellant telephoned the sheriff's office for assistance and advised that he would go to the front door of his home with his hands in the air when the authorities arrived. He followed this procedure and met the officers in his front yard. By the time the objectionable search occurred he had been removed from the premises. Such conduct cannot be construed as an invitation to search one's home.

This reasoning finds support in recent decisions by the Colorado Supreme Court and the Illinois Appellate Court. In *People v. Roark,* Colo., 643 P.2d 756 (1982), the court determined that an emergency call to the police station reporting a death did not constitute a consent to search the premises

after the occupants had been removed and the emergency had passed. The court in *People v. Annerino,* 97 Ill.App.3d 240, 52 Ill.Dec. 714, 422 N.E.2d 923 (1981), refused to find that the defendant consented to a warrantless search of his home by reporting a fatality to the police and requesting assistance in removing the victim from his kitchen.

I would have hoped that this court would be extremely cautious in expanding exceptions to the warrant requirement and would not have found an implied consent to search where no express consent was given. It seems to me that we are charged with jealously protecting those safeguards which insure that all people remain free from unreasonable searches and seizures.

" * * * If this court is not careful, we are going to chip away at the Fourth Amendment rights of the American citizen until—one day—they will have disappeared altogether. We must never forget that these rights were forged out of the steel and fire of bitter human experience which warns that, for all of those who may one day need the protecting arms of the criminal justice system (including you and me), there must be ground rules which will protect against the unscrupulous, the overzealous and their wiles. To pretend that these threatening forces have not found and will not find their way into the system is to close our eyes to reality, which we do at the risk of collapsing the greatest criminal justice system the mind of man has ever devised." *Jessee v. State,* Wyo., 640 P.2d 56, 73 (1982) (ROSE, Chief Justice, dissenting).

II

It has long been my position that courts should exercise extreme caution in admitting evidence of prior bad acts in criminal cases. *Grabill v. State,* Wyo., 621 P.2d 802 (1980), dissenting opinion; *Goodman v. State,* Wyo., 601 P.2d 178 (1979), dissenting opinion. The danger in admitting such evidence is that it requires the defendant to meet and explain conduct other than that with which he is charged. Such testimony has a recognized tendency to lead the jury to believe that it is permissible to convict for acts other than those for which the defendant is on trial. *Kwallek v. State,* Wyo., 596 P.2d 1372, 1378 (1979).

It is conceded that under Rule 404(b), W.R.E., evidence of prior wrongdoing is admissible to prove motive, inter alia. However, such evidence may be excluded under Rule 403, W.R.E., when its probative value is substantially outweighed by the danger of unfair prejudice. Evidence which is shocking, sensational, or evocative of hostility or punitive impulses has been deemed unfairly prejudicial and, therefore, inadmissible. *Goodman v. State,* 601 P.2d at 184; 2 Louisell & Mueller, Federal Evidence, § 126, pp. 16–18.

In this case the incident described by the State's witness, a neighbor of Ortega, occurred two months prior to the shooting. The witness testified that from his ground floor bathroom window, he observed an altercation between Mr. and Mrs. Ortega. The witness' vision was obscured by a fence, seven feet high. He was unable to hear what was said, and did not actually see appellant urinate on Mrs. Ortega. It is not at all clear to me that testimony of this quality, concerning an incident which occurred two months earlier, had probative value in proving Ortega's motive on the night of the shooting. Given the highly inflammatory nature of this testimony and the likelihood that it would generate feelings of hostility toward the defendant, I conclude that the danger of unfair prejudice substantially outweighed any possible probative value. It was error to admit this evidence and subject Richard Ortega to the risk of conviction for improper reasons.