**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Stephen J. RICCIO, Defendant/Appellant.**

No. 83–1025.

United States Court of Appeals,
Tenth Circuit.

Jan. 30, 1984.

Rehearing Denied March 15 1984.

Robert Gay Guthrie, Asst. U.S. Atty., Denver, Colo. (Robert Miller, U.S. Atty., Denver, Colo., with him on the briefs), of the District of Colorado, for plaintiff/appellee.

John M. Richilano, Asst. Federal Public Defender, Denver, Colo. (Michael Katz, Federal Public Defender, Denver, Colo., with him on the briefs), of the District of Colorado, for defendant/appellant.

Before SETH and SEYMOUR, Circuit Judges, and CHILSON *, District Judge.

CHILSON, Judge.

The appellant, Riccio, was indicted, tried, and convicted of the armed robbery of the Burns National Bank of Durango, Colorado, on June 11, 1982, in violation of 18 U.S.C. § 2113(a), (d) and (e).

Prior to trial, Riccio moved to suppress certain evidence seized by police officers from Riccio's residence, pursuant to a search warrant.

Among the articles seized were $14,826.00 of United States currency. The ground for the motion to suppress was that the seizure was the result of an illegal search of Riccio's residence in violation of the Fourth Amendment to the United States Constitution.

The trial court, after an evidentiary hearing, denied the motion to suppress and this denial is the sole ground for appellant's appeal.

At the suppression hearing, appellant called two witnesses, Lt. Smith of the Durango Police Department, who headed the investigation of the crime and Jasper Vallejos, a reserve officer of the Police Department, who participated in the investigation.

The evidence submitted at the hearing is not in dispute in any material respects. The evidence reveals that about noon on June 11, 1982, the Durango Police were notified of an armed robbery of the Burns National Bank by a male individual wearing a ski mask and armed with a pistol.

Lt. Smith, with the assistance of other officers and F.B.I. agents, began an immediate investigation from which they obtained the following information.

At about noon on June 11, 1982, the robber entered the bank wearing a ski mask and armed with a pistol. He approached a bank teller, one Sandra Bush, and demanded that she collect currency from all the teller drawers and put it in a brown paper sack which he produced. She complied and placed all the currency in the brown paper sack. The robber took the sack, ran out of the bank and stopped a passing motorist, one Raymond Foster, at gun point. He ordered Foster to take him across the Ninth Street Bridge to the JayCee Campground. Foster complied. At the campground, the robber left the Foster car and disappeared into the hills.

Sandra Bush informed an officer that she believed the voice of the robber to be that of a person known to her as "Steve" who had previously cashed salary checks of the Federal Lumber Company at the bank. She also stated that she believed "Steve" had been fired by the company.

A surveillance camera in the bank photographed the robber in the act of robbing the bank with a gun. The bank supplied this picture to the officers.

One of the officers was informed by an employee of the Federal Lumber Company that Steve Riccio had been employed by the company, but was recently fired. He furnished the officer with Riccio's address which was a trailer house in Perrins Peak Trailer Park, in Durango, Colorado, and gave the officer a description of the physical appearance of Riccio.

An officer of the bank informed Smith that the amount taken in the robbery was in excess of $18,000.00.

After the foregoing information was obtained, the officers went to Riccio's trailer

---

* Hatfield Chilson, Senior Judge, United States District Court for the District of Colorado, sitting by designation.

house about 3:00 P.M. Riccio was not there, but his two roommates, Blauart and Testoni, were in the trailer. They informed the officers that Riccio was not there, that he had been fired by the lumber company and had informed them that he planned to leave the area the next day to seek employment.

When shown the picture of the robber taken at the bank, Blauart said he had not known Riccio long enough to identify it as a picture of Riccio.

Testoni said he was a classmate of Riccio in high school, that they were old buddies and that the picture looked similar to a photograph of Riccio which was in the trailer.

The roommates left the trailer and agreed not to return without the officers' permission.

Between 3:00 and 4:00 P.M., Lt. Smith left the trailer to make arrangements to put the trailer house under surveillance. The surveillance was established about 7:00 P.M.

The surveillance consisted of parking a van where the officers inside the van could see the front doors of the trailer, but there was no surveillance of the back of the trailer which contained windows through which it was possible for a person to enter the trailer without being seen by the surveilling officers.

About 9:30 or 10:00 P.M., one of Riccio's roommates entered the trailer by the front door and came out with a rifle and pistol stating to the officers he was taking them "so there would be no danger". He was not detained and left.

About 10:30 P.M., the officers saw a man enter the trailer. Lt. Smith was notified and arrived shortly thereafter and stationed officers around the trailer.

By loud speaker, Smith identified himself to the occupant of the trailer and advised the occupant that police officers had the trailer surrounded and asked him to come out with his hands in the air.

Within thirty seconds thereafter, four shots were fired from a window of the trailer in Smith's direction. The officers did not return the fire. Smith again tried to talk the occupant into coming out of the trailer. The response was two more shots out of the same window fired in Smith's direction.

Smith continued to urge the occupant to give up and come out of the trailer. The occupant then indicated he wanted to give up. The man, later identified as Riccio, came to the front door with a pistol in his right hand, dropped to a crouching position, and fired another shot in Smith's direction.

One of the police officers fired at Riccio who fell back into the trailer house.

Smith then requested Riccio to throw the pistol out the door, but some twenty minutes elapsed before Riccio complied and threw the pistol out the front door.

Thereupon, the officers entered the trailer and found Riccio on the floor with a bullet wound in his chest.

Two officers immediately began to administer aid to Riccio and other officers went in different directions throughout the trailer to secure the trailer and make sure no one else was in it. This is referred to by the parties as a "sweep" or "security search". In the course of this search, Smith saw on the bed in the middle bedroom, a large amount of currency which was in part banded with Burns National Bank currency bands.

The currency was not seized at that time, nor was any search made of the premises other than the observations of the officers in going through the trailer to ascertain whether or not there was anyone else in it.

The officers then assisted in transporting Riccio to the hospital. Smith then obtained a search warrant. The officers returned to the trailer and pursuant to the warrant, seized the currency and other items inventoried in the return of the warrant.

The motion to suppress attacks the validity of the search warrant on the ground that the affidavit, pursuant to which the warrant was issued, contains false statements which were known by the affiant to be

false or were made with reckless disregard for the truth.

The appellant bases this assertion upon two statements in the affidavit. The first statement is as follows:

"Your affiant showed the picture taken during the bank robbery to roommates, Testoni and Blauart who indicated a belief that the photographed robber could be Steve Riccio."

From a review of the evidence, the foregoing statement is inaccurate in that Blauart stated he could not identify the picture as being a picture of Riccio. It was Testoni who stated a belief that the picture could be that of Riccio.

At the hearing, there was no evidence to indicate that the statement was knowingly false or made with reckless disregard of the truth.

In fact, appellant's counsel stated at the hearing:

The fact that Blauart did not make that statement was overlooked and was included by mistake. I don't say at this time that was a reckless disregard of the truth. (P. 67, Vol. II, Record)

The trial court held that in determining the validity of the search warrant, the Court must look at the affidavit as a whole and that the unchallenged statements in the affidavit presented ample facts to justify the issuance of the search warrant.

■ We agree and hold that the inaccurate statement contained in the affidavit did not invalidate the warrant, since there are sufficient accurate statements of fact in the affidavit which support the issuance of the warrant. *Franks v. Delaware,* 438 U.S. 154 at 171–172, 98 S.Ct. 2674 at 2684–85, 57 L.Ed.2d 667 (1978).

■ The motion to suppress also alleges that the following statement in the affidavit was made knowing it to be false or with reckless disregard of the truth:

Your affiant and fellow officers searched the trailer looking for other occupants. In a middle bedroom earlier identified by roommates as the bedroom of Stephen Riccio, on the bed was observed a large amount of currency.

The motion also asserts:

In truth and in fact, the affiant knew that the residence had been under surveillance for at least two hours prior to the confrontation with the defendant ----.

In arriving at the conclusion that the officers knew there were no other occupants of the trailer, appellant ignores the undisputed evidence that the surveillance was only of the front of the trailer and that it was possible for a person to enter the trailer through the rear windows without being seen by the surveilling officers. The appellant's conclusion that the officers "knew" there was no one else in the trailer at the time of the shooting is not supported by the evidence.

The law applicable to warrantless searches of a residence is well established.

In *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), the Supreme Court said:

There is ample justification ... for a search of the arrestee's person and the area within his immediate control .... There is no comparable justification, however for routinely searching any room other than that in which the arrest occurs ... Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant.

Most circuits have recognized one such exception to be that:

When officers have arrested a person inside his residence, the exigent circumstances exception permits a protective search of part or all of the residence when the officers reasonably believe that there might be other persons on the premises who could pose some danger to them.

See *U.S. v. Gardner,* 627 F.2d 906, 909 (9th Cir.1980); *U.S. v. Tabor,* 722 F.2d 596 (10th Cir.1983); *U.S. v. Hatcher,* 680 F.2d 438, 444 (6th Cir.1982); *U.S. v. Baker,* 577 F.2d 1147, 1152 (4th Cir.1978); *U.S. v.*

*Jones,* 696 F.2d 479, 487 (7th Cir.1982); *U.S. v. Kolodziej,* 706 F.2d 590, 596 (5th Cir. 1983); *U.S. v. Dien,* 609 F.2d 1038, 1047 (2nd Cir.1979); *U.S. v. Lyons,* 706 F.2d 321, 331 (D.C.Cir.1983); *U.S. v. Irizarry,* 673 F.2d 554, 558 (1st Cir.1982).

In *U.S. v. Cuaron,* 700 F.2d 582, 586 (10th Cir.1983), the court stated:

> The Government has the burden of establishing that exigent circumstances made the warrantless entry necessary. *United States v. Baca,* 417 F.2d 103, 106 (10th Cir.1969), *cert. denied,* 404 U.S. 979 [92 S.Ct. 347, 30 L.Ed.2d 294] (1971). In assessing whether the burden was met, we are "guided 'by the realities of the situation presented by the record.'" *United States v. McEachin,* 670 F.2d 1139, 1144 (D.C.Cir.1981) (quoting *United States v. Robinson,* 533 F.2d 578, 581 (D.C.Cir.1976) (en banc)). We should "evaluate the circumstances as they would have appeared to prudent, cautious and trained officers." [*United States v.*] *Erb,* 596 F.2d [412] at 419 (citing *United States v. Brown,* 540 F.2d 1048, 1055 (10th Cir.1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 548 (1977)).

In *U.S. v. Astorga-Torres,* 682 F.2d 1331 (9th Cir.1982), officers were denied entry into a motel cabin to make an arrest. The officers kicked in the door and were confronted by one of the appellants with a revolver. He fired at the officers who responded with a shot from a shotgun wounding one of the appellants. This initiated a sporadic exchange of gunfire from the door of the cabin and a bathroom window.

Finally, officers fired tear gas into the cabin and thereupon the appellants threw out their guns and came out with their hands up.

Thereupon one of the officers entered the cabin to satisfy himself that no one else was in the cabin. During this search, the officer observed debris in the toilet bowl which he removed and which was later admitted into evidence.

Appellant sought to suppress the debris on the ground that it was obtained by a warrantless search. The Court held at pages 1334 and 1335:

> Further it was proper for Agent Plavan to enter the cabin following the shootout. While the presence of anyone else in the cabin was most unlikely, cf. *United States v. Gardner,* 627 F.2d 906, 911 (9th Cir. 1980) (protective search of premises permissible when officers reasonably believe additional dangerous persons may be present), officers who have been subjected to pistol fire from the front door and bathroom window can hardly be said to be acting unreasonably when they take steps to make sure of their safety. "Courts must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger." *United States v. Coates,* 495 F.2d 160, 165 (D.C.Cir.1974).

The Court also stated at page 1335:

> Once lawfully inside the cabin, it was proper for the agent to seize any evidence which he observed in plain view. *Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971).

The trial court found that it was not unreasonable for the officers to believe that Riccio might have had an accomplice to assist him in a "getaway" after the robbery. The trial court also found that the shots fired from the trailer at the officers at different times and from different places within the trailer were sufficient to lead the officers to believe that there might be more than one occupant of the trailer and concluded that the exigent circumstances which existed at the time the officers entered the trailer justified a sweep search of the trailer to determine whether or not there were other occupants of the trailer other than Riccio.

*Warrantless Entry and Arrest*

The motion to suppress did not address the question of the warrantless entry into the trailer and the warrantless arrest of the appellant. The question was raised for the first time in appellant's brief.

Ordinarily, appellate courts do not consider questions which were not raised before the trial court, but we elect to do so in this case.

In *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978), the Supreme Court stated:

> We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.

█ The uncontroverted evidence reveals that appellant came to the front door of the trailer and shot at Lt. Smith. Thereupon one of the officers shot at the appellant, who fell backward into the trailer. The officers had reason to believe that appellant was shot and might be in need of immediate aid.

The officers entered the trailer and found appellant on the floor with a bullet wound in his chest, and that he was in need of immediate aid which the officers provided. The officers then had the appellant removed to a hospital for further medical treatment.

In these circumstances, the officers were amply justified in entering the trailer and removing the appellant to the hospital for medical treatment.

In the circumstances of this case, the officers would have been derelict in their duties to have delayed entry into the trailer until an arrest warrant could be obtained.

> It is well established that at a hearing "on a motion to suppress the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions, and conclusions fairly and reasonably to be drawn from the evidence, are to be determined by the trial judge," whose determinations we must accept unless clearly erroneous. *United States vs. Gagnon,* 635 F.2d 766, 769 (10th Cir.1980), citing *United States vs. Donahue,* 442 F.2d 1315, 1316 (10th Cir.1971).

We have reviewed the evidence and find that the trial court's denial of the appellant's motion to suppress is not clearly erroneous and has ample support in the evidence and the law.

The trial court's denial of the motion to suppress is AFFIRMED.