**Dianne BROWN, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 86–104.

Supreme Court of Wyoming.

June 16, 1987.

Leonard Munker, State Public Defender, Julie D. Naylor, Asst. Public Defender, Gerald M. Gallivan, Director, Wyoming Defender Aid Program, and Edward G. Luhm (argued), Student Intern for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., Judith A. Patton, Asst. Atty. Gen., and James Baiamonte (argued), Legal Intern, for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

Appellant was convicted of possessing methamphetamine with intent to deliver in violation of §§ 35–7–1031(a)(ii) and 35–7–1016(d)(ii), W.S.1977. Her sentence was suspended, and she was placed on probation for a period of four years. Although appellant raises several issues on appeal, we need only determine whether the trial court erred in refusing to suppress evidence obtained in a search of her residence.

We reverse and remand.

FACTS

The narcotics division of the sheriff's office of Campbell County suspected appellant "possibly was dealing in narcotics." They did not arrest appellant, presumably because they lacked sufficient evidence for

an arrest. Being good police officers, we would assume that they had a desire to obtain evidence for an arrest. So when appellant was sued for the sum of $50.00 in small claims court, Officer Mader was informed that appellant might be dealing in narcotics and dispatched to her home to serve the small claims court summons and complaint. There was nothing wrong to this point. Ordinarily, a process server would simply hand the complaint and summons to appellant and leave. There is nothing wrong with that.

But here the officer, after knocking on the door, heard footsteps, dogs barking, and a methodical clip like an automatic weapon, all of which he mentally noted to be suspicious activity. Then appellant opened her door, unarmed and wearing pajamas. There was nothing wrong up to this point and surely standard procedure would have been simply to hand her the complaint and summons and leave. But there was something different about this case. The officer asked if anyone else was home. That was totally unrelated to the service of a civil complaint and summons upon a $50.00 claim. Appellant answered yes, her boyfriend was in the house. The officer then entered her home and to his dismay observed an empty knife sheath on the floor. That was enough for the officer who by now was so frightened of the lady in pajamas that he served the complaint and summons and left.

If serving the small claims court summons and complaint was the purpose of this encounter, it had been successful and was over; but if obtaining evidence of appellant's suspected dealing in narcotics was the purpose, the encounter had been singularly unsuccessful. And so Officer Mader, after leaving appellant's residence, met with Officers Bagwell and Cannon, who had been in the area ready to provide backup in the service of the small claims court $50.00 complaint and summons. After some discussion, Officers Bagwell and Cannon returned to the sheriff's office; and shortly thereafter Officer Mader received a call from the sheriff's office dispatcher that "someone [in the office] had come up with a warrant" for appellant's arrest and

"they wanted it served." The arrest warrant was for a minor traffic citation that had occurred approximately two years before. For two years there had apparently been no urgency about this warrant. But now it was so imperative that a team of four officers was dispatched to appellant's home to arrest this lady in pajamas. We must keep in mind the danger confronting the officers in this arrest for it was later suggested that officers had been shot and killed in these kinds of situations. Two officers conducted a surveillance, and Officer Mader requested that Corporal Murphey of the sheriff's office go with him to serve the warrant.

Deputy Sheriffs Hagerman and Lauck had undertaken surveillance of appellant's residence. Deputy Lauck was a narcotics agent for the sheriff's office, and he "wanted to look at the situation." In the course of their surveillance, Deputies Hagerman and Lauck observed "a large white male adult enter and leave the residence on foot, go to vehicles and back into the house several times." They also saw "a white female adult go in and out the front door several times, feed a dog, various things."

When Officer Mader and Corporal Murphey arrived at appellant's residence, Deputies Lauck and Hagerman informed them, by radio, that appellant and a male subject (later identified as appellant's boyfriend, Arthur Toews) had been seen outside the mobile home. The two officers walked to the front porch, and appellant was waiting at the door. One of the officers told her that they had a warrant for her arrest and asked her where "the man" was. Appellant called Mr. Toews, and he stepped outside. At this point the officers knew that everyone in the trailer was outside on the porch; that appellant, the lady in pajamas, was the person named in the warrant in their possession; that all they needed to do was serve the warrant; and that if they felt it necessary, take her into custody and return to the sheriff's office. But that course of events would have resulted in no evidence of "possible dealing in narcotics." So a very fortuitous thing happened. Again appellant turned and walked into her

mobile home, and this time Corporal Murphey followed her in. What was he to do when this lady in pajamas began to leave? After all, that is where the evidence of narcotics must be anyway. And so Corporal Murphey immediately followed appellant into her home and there saw on the floor the empty knife sheath which he immediately recognized as a dangerous situation. He yelled to Officer Mader, who was on the porch with Mr. Toews, that a weapon was unaccounted for. Corporal Murphey then told appellant that he was going to conduct a "protective sweep" of the premises and asked her if she would lead him through the mobile home. Appellant complied, leading Corporal Murphey to the kitchen, bathroom, rear bedroom, front bedroom and back to the living room. Upon returning to the living room, Corporal Murphey spotted a metal tray containing something that looked like marijuana. He walked to the tray, inspected it, and concluded that the substance was indeed marijuana.

After the marijuana was found, appellant was taken to jail, her mobile home was secured, and Corporal Murphey obtained a search warrant, his discovery of marijuana providing the requisite probable cause. A subsequent search pursuant to that warrant uncovered 14.1 grams of methamphetamine and other evidence of narcotics.

After this evidence was discovered, appellant was charged with possession of a controlled substance with intent to deliver. Before trial she moved to suppress the evidence found in her home, contending that the initial entry and "protective sweep" were illegal and therefore the subsequent search was illegal. After a hearing the court denied the motion, finding that the protective sweep was justified by the totality of the circumstances, that the protective sweep was "not of such an intensive nature to be violative of the 4th Amendment," and that the discovery of the marijuana cigarette fell under the plain-view doctrine.

On appeal, appellant now renews her contention that the protective sweep was an unreasonable search under the Fourth Amendment to the United States Constitution and Art. I, § 4 of the Wyoming Constitution and that the evidence revealed in the subsequent search was inadmissible as fruit of the poisonous tree. In response, the State offers three alternative arguments: (1) the protective sweep was reasonable, (2) the discovery of the marijuana was not a result of the protective sweep but instead was the result of a search incident to arrest after the protective sweep was completed, and (3) when Corporal Murphey accompanied appellant through her home and discovered the marijuana in "plain view," he was merely exercising his right, pursuant to *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), to monitor the movements of an arrestee and observe evidence in plain view.

## EXCEPTIONS TO THE WARRANT REQUIREMENT

■ Article I, § 4 of the Wyoming Constitution provides:

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized."

We have held that a home is entitled to special dignity and special sanctity and that the proper way to search a home is to obtain a search warrant. *Goddard v. State*, Wyo., 481 P.2d 343, 344 (1971). Moreover, searches and seizures made without a warrant or outside the judicial process are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *Kish v. State*, Wyo., 642 P.2d 453, 455 (1982). Two exceptions which we have recognized are the search-incident-to-arrest exception and the plain-view doctrine. *Ortega v. State*, Wyo., 669 P.2d 935, 940–941 (1983). This court has not ruled on the validity and scope of the "protective sweep doctrine" nor have we determined whether the rule pronounced by the United States Supreme

Court in *Washington v. Chrisman,* supra, 102 S.Ct. at 817, which allows a police officer to "monitor the movements of an arrested person, as his judgment dictates, following [an] arrest" and observe evidence in plain view while doing so, is compatible with our state constitution.

In reviewing the district court's ruling, we are bound by that court's findings unless they are clearly erroneous. *Neilson v. State,* Wyo., 599 P.2d 1326, 1330 (1979), cert. denied, 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980). The district court found that the protective sweep was justified by the totality of the circumstances. We conclude that this finding was clearly erroneous.

The Tenth Circuit Court of Appeals has defined the protective sweep doctrine in the following terms:

"When officers have arrested a person *inside his residence,* the exigent circumstances exception permits a protective search of part or all of the residence when the officers reasonably believe that there might be other persons on the premises who could pose some danger to them." *United States v. Riccio,* 726 F.2d 638, 641 (10th Cir.1984). (Emphasis added.)

Here appellant was arrested outside her home, and we can find nothing in the record to support a reasonable belief that there might be other persons inside appellant's home who posed a threat to the officers' safety. The information gained through the surveillance of appellant's home supported her assertions that her boyfriend was the only other person on the premises, and he had already stepped outside.

■ A protective sweep was not warranted under these circumstances. Moreover, we conclude that the court's ruling is not supportable by a reasonable view of the evidence. To the contrary, the record convinces us that appellant's arrest, pursuant to an outstanding warrant, was merely a pretext utilized by the sheriff's office to enable them to search appellant's home for evidence of narcotics.

Numerous state and federal courts have held that an arrest may not be used as a pretext to search for evidence of an unrelated crime. See Burkoff, The Pretext Search Doctrine: Now You See It, Now You Don't, 17 U.Mich.J.L.Ref. 523 (1984); 2 W. LaFave, Search and Seizure, § 5.2(e) (2nd ed. 1987). A pretext search occurs when officers depart from routine procedure and engage in arrest and search activity which "would not have been undertaken *but for* [an] 'underlying intent or motivation' which, standing alone, could not supply a lawful basis for the police conduct." 1 LaFave, supra, § 1.4(e) at 93. (Emphasis in original.) Thus, in *State v. Blair,* Mo., 691 S.W.2d 259 (1985), the police suspected defendant of homicide. The court stated:

"On January 23, Detective Lauffer requested that defendant be picked up for homicide but did not ask for a homicide arrest or search warrant because he believed there was not enough evidence to support a warrant. The police then learned that she was the subject of an outstanding city warrant for a traffic violation." *Id.* at 260.

Defendant was arrested and

"[a]fter the interrogation, the officer requested that her palm print be compared with that taken from the crime scene. * * *

"On February 8, 1982, upon learning that defendant's print matched the print found at the scene of the crime, police sought and received an arrest warrant on the homicide. * * * During an interrogation that began at 6:15 p.m., officers confronted her with evidence of the matching prints and obtained inculpatory statements." *Id.* at 260.

The State contended

"that once a legal basis for an arrest exists—in this case the outstanding traffic warrant—the subjective motives of the police become irrelevant * * *." *Id.* at 260–261.

The court held the unrelated traffic warrant arrest a pretext to search for evidence and suppressed the evidence stating:

"A well established limitation on the search incident to a valid arrest excep-

tion is the rule that an arrest may not be used as a pretext to search for evidence." *Id.* at 262.

Given the circumstances surrounding appellant's arrest and the intensity of the initial search of her home in this case, we cannot escape the conclusion that the underlying intent or motivation for the arrest and search was the officers' desire to search appellant's home for evidence of narcotics.

It is nonsense to say that the situation here and this appellant in her pajamas posed any great danger to the officers. It is silly to say that anyone was in danger of being shot. The simple fact is there was no danger at all to anyone. Entering appellant's home pursuant to a two-year-old traffic citation was a ruse and done for the purpose of gathering evidence to permit charging another crime. To condone this pretext search is to condone conduct which violates the constitutional rights afforded every citizen of this country against unreasonable search and seizure. That others may violate the law is no justification for law enforcement to do so. They are sworn to uphold the law and above all else should recognize and honor the constitution and the rights afforded by it to the citizens of this country. This pretext search was unlawful, and the evidence obtained thereby should have been suppressed.

The dissenters' conclusion that appellant "disavowed" the pretext arrest theory is unsupported by the record. When discussing the concept below, defense counsel merely took the position that the evidence should be suppressed *even if* bad faith could not be demonstrated. When the court asked if the critical issue was whether the search was a "ruse," defense counsel replied:

> "We don't have to have them—I mean, that's fraud. That's—that's illegal. *We don't have to * * * go to that extent to exclude this.*" (Emphasis added.)

We do not interpret this as a "disavowal," and neither did the district court, as is demonstrated by the following exchange between the judge and the prosecutor:

> "THE COURT: Well, there are some facts, however, that suggest—and I would say more than just casually—that the Sheriff's Office would—very much wanted to be able to know what was inside that house. The fact that all the backup people were narcotics officers— or that a good number of them were narcotics officers—is certainly suggestive of that.
>
> "MR. COWAN: I would agree, Your Honor, that perhaps they did. But what we have to be concerned here with is whether they did anything that violated the Fourth Amendment in doing that. I would suggest that they did not.
>
> "If you look at the search warrant itself—
>
> "THE COURT: They sure did if the protective search was merely a—or screen or whatever you call it—was merely a reason to get an opportunity to take a good look around the house."

In light of this discussion at the suppression hearing, it is strange that the dissenters still wonder "how the pretextual arrest proposition became present in this appeal." In addition to the discussion quoted above, we also note appellant's brief, which cites *Taglavore v. United States*, 291 F.2d 262 (9th Cir.1961), for the proposition that traffic-related arrests should not be used to engage in overbroad searches. Taglavore is a leading case on the subject of pretext arrests. And while the dissenters' familiarity with Hans Christian Andersen is commendable, we suggest a review of the cases cited in the appellate briefs before resorting to fairy tales.

■ It has been held that "[w]hen the arrest is merely a subterfuge for conducting a search, the search is illegal in spite of the validity of the arrest." *Commonwealth v. Freeman*, 222 Pa.Super. 178, 293 A.2d 84, 85 (1972). In the present case, the State did not even establish the validity of the arrest. No arrest warrant appears in the record. If we were to uphold the search conducted in this case on the record before us, we would open the door to the possibility of warrantless general searches of the homes of every citizen ever given a

traffic citation. Law enforcement officers may not use the pretext of an arrest on a minor charge as a means to engage in an overbroad search to uncover evidence of an unrelated offense.

■ The State contends that regardless of the propriety of the protective sweep, the search was permissible under the United States Supreme Court's decision in *Washington v. Chrisman,* supra, 102 S.Ct. 812. In Chrisman, the Court held that arresting officers may monitor the movements of an arrestee and, while doing so, observe any evidence in plain view. In this case, the officers did more than "monitor" appellant's movements. After Corporal Murphey had followed appellant inside, he took the opportunity to prolong and expand the "plain view" search, ultimately searching the entire home. We refuse to apply the plain-view doctrine in these circumstances.

## FRUIT OF THE POISONOUS TREE AND THE EXCLUSIONARY RULE

The marijuana discovered by Corporal Murphey during his initial search of appellant's premises provided probable cause for the search warrant. The subsequent search conducted pursuant to the search warrant resulted in the discovery of the evidence which appellant sought to suppress. In *Goddard v. State,* supra, 481 P.2d at 345, we held that

"if the initial search is held improper, not only the evidence obtained by such search but everything which becomes accessible to the prosecution by reason of the initial search would be inadmissible as 'a fruit of the poisonous tree.'"

In this case the evidence found pursuant to the search warrant became accessible to the prosecution only as a result of the illegal initial search and, therefore, that evidence constitutes fruit of the poisonous tree.

We conclude that the exclusionary rule must be applied in this case. The reason for condemning "bad faith" or "pretext" searches is explained by one commentator in the following terms:

"[T]he unconstitutionality of 'bad faith' searches is compelled by the need to restrict police discretion—a policy that is at the heart of the fourth amendment. In a 'bad faith' search, the police officer's actions may be based solely upon suspicion or whim, or worse. This type of discretion in the hands of the police is one of the abuses that the requirements of the fourth amendment were expressly designed to curtail." Burkoff, Bad Faith Searches, 57 N.Y.U.L.Rev. 70, 102–103 (1982).

In *Fondren v. State,* Wyo., 724 P.2d 461, 462 (1986), we held that the purpose of the exclusionary rule is to deter unlawful police conduct. The conduct of the police officers in this case amounted to an attempt to circumvent Art. I, § 4 of the Wyoming Constitution. We find the exclusionary rule to be particularly appropriate here.

Reversed and remanded.

THOMAS, J., filed a dissenting opinion in which BROWN, C.J., joins.

THOMAS, Justice, dissenting, with whom BROWN, Chief Justice, joins.

I have struggled to discover what is wrong with this case. Certainly, it is not a wrongful act to serve a civil summons and complaint. Neither is it wrong for an officer serving that civil summons and complaint to observe the surroundings in which it is served. I cannot believe that in Wyoming it is wrong to serve an arrest warrant. Furthermore, reasonable efforts on the part of arresting officers to protect themselves should not be denigrated. Lastly, our law justifies the seizure of contraband which is perceived in plain view at a place where an officer has a right to be. I am not persuaded that the Supreme Court of this State chooses to indiscriminately set aside convictions of possessing drugs with intent to distribute them. I am pressed to the conclusion that what is wrong in this case is the failure of the majority to perceive the role of this Court, to understand the facts established by the record and to follow appropriate rules of law in deciding the issues. Without question, I would affirm Dianne Brown's conviction.

The majority says, "[T]he record convinces us that appellant's arrest, pursuant to an outstanding warrant, was merely a pretext utilized by the sheriff's office to enable them to search appellant's home for evidence of narcotics." Later the majority says that, "[W]e cannot escape the conclusion that the underlying intent or motivation for the arrest and search was the officers' desire to search appellant's home for evidence of narcotics." Those are factual determinations, and an appellate court does not resolve questions of fact. As we said in *Neilson v. State*, Wyo., 599 P.2d 1326, 1330 (1979), cert. denied, 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980):

> " * * * First, the trial court did not make findings on appellants' motion to suppress. When such findings are made, they are binding on this court unless clearly erroneous. When such findings are not made, this court upholds the general ruling of the trial court if it is supportable by any reasonable view of the evidence." (Citations omitted.)

To the same effect with respect to the failure to make findings is *Patterson v. State*, Wyo., 691 P.2d 253 (1984), cert. denied, sub nom. *Spoon v. Wyoming*, 471 U.S. 1020, 105 S.Ct. 2048, 85 L.Ed.2d 311 (1985).

In this case, following the presentation of testimony at a hearing, the district court in its Order Denying Defendant's Motion to Suppress stated:

> "THE COURT FINDS AND CONCLUDES:
>
> "1. The law enforcement officer's protective sweep of the above named defendant's home was justified by the totality of the circumstances.
>
> "2. The protective sweep was not of such an intensive nature to be violative of the 4th Amendment.
>
> "3. The controlled substances found by the officers, and subsequently used as a basis for a search warrant, falls under the "Plainview Doctrine."

> "4. The scope of the search, conducted pursuant to the search warrant, was reasonable and conformed with the description of the places and things to be searched for, set out in the search warrant."

According to *Neilson v. State*, supra, because the district court made no finding with respect to pretextual search, this court should uphold the suppression if it is supportable by any reasonable view of the evidence. Clearly, it is.

Of course, the quoted findings and conclusions of the district court do not specifically address the concept of pretextual search. There is a reason for that. It was expressly disavowed by the appellant in the district court. The transcript of the hearing on the motion to suppress establishes the disavowal:

> "THE COURT: Does it come down, then, in your view—does the analysis finally sift down to a question of whether or not, based upon the totality of the facts, it appears that this search was merely, as you recall it, I think, earlier, a ruse and it was that—the purpose was to go there and figure some way to get in the house and look around—
>
> "MR. SOWADA: No. No.
>
> "THE COURT: As opposed to protecting yourself? I don't think it comes down to that kind of an analysis.
>
> "MR SOWADA: No. I think that civil liability comes down to that kind of analysis, and I don't think it would be justifiable in this case. That's where civil liability ought to come in."

The court has a disagreement about what the record discloses. Consequently, attached hereto as Appendix A are photocopies of pages 91 and 92 of the transcript of the hearing on the motion to suppress evidence. These pages followed some 18 pages of dialogue about the protective sweep.

One may ask how the pretextual arrest proposition became present in this appeal. Literally, the answer is from nowhere or perhaps from everywhere.[1] The majority

---

**1.** One is reminded of the marvelous wisdom contained in Hans Christian Andersen's wonderful tale "The Emperor's New Clothes." Hans Christian Andersen, Eighty Fairy Tales (Pantheon Books, New York 1976).

of the court is persuaded that the doctrine of pretextual arrest was a concern of the court. Attached hereto as Appendix B are photocopies of pages 129 through 134 of the transcript of the hearing on the motion to suppress evidence which encompass the decision of the court announced from the bench. The concept of pretextual arrest is absent from these remarks. In *Harries v. State*, Wyo., 650 P.2d 273, 277 (1982), this court was confronted with a failure to instruct on a theory first asserted by the appellant on appeal, and we said:

"* * * The trial court was not asked to pass upon the legal aspect of the proposition. Accordingly, we cannot further consider the contention.

'* * * [W]e will not consider matters raised for the first time on appeal unless they go to jurisdiction or are otherwise of such a fundamental nature that the court must take cognizance of them. * * *' *Nickelson v. People*, Wyo. 607 P.2d 904, 908 (1980)."

The upshot is that the majority opinion in this case chooses to reverse a conviction based upon a theory which was not presented or argued in the trial court, and which is not eligible for consideration under the concept of plain error. We find manifested an omniscience which appellate courts generally disavow and always should eschew.

Even if the issue were before us, it is erroneously decided. In this opinion, the court rejects the method of analysis that has been followed by this court and has come to be recognized as proper for determining the constitutionality of a search, that is whether or not the search objectively was reasonable. E.g., *Ortega v. State*, Wyo., 669 P.2d 935 (1983); *Kish v. State*, Wyo., 642 P.2d 453 (1982); *Jessee v. State*, Wyo., 640 P.2d 56, reh. denied, 643 P.2d 681 (1982). Instead, this court chooses to make its own subjective evaluation with respect to the officers' motives in conducting a lawful search. The conclusion is that because the arrest of the appellant by the execution of a valid warrant must have been a pretext for a search, the appellant is entitled to have her conviction set aside.

The pretext arrest rationale probably should not apply in cases where there is a pre-existing warrant outstanding. *State v. Davis*, 35 Wash.App. 724, 669 P.2d 900 (1983). More positively, in its recent cases, the Supreme Court of the United States definitely has indicated that the subjective rationale of officers conducting a search is not relevant to a determination of the constitutionality of the search. The question is whether the officers' conduct was lawful under an objective standard. Any subjective evaluation is limited to the determination of whether the exclusionary rule should be applied once objective unlawfulness has been identified. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Patterson v. State*, supra.

The majority relies upon *State v. Blair*, Mo., 691 S.W.2d 259 (1985), cert. granted, —— U.S. ——, 106 S.Ct. 784, 88 L.Ed.2d 762 (1986), dismissed on the ground that the writ of certiorari was improvidently granted, —— U.S. ——, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987). It is unfortunate that the majority did not also note the discipline with which that court approached the case. There the finding of pretextual arrest was made as one of fact in the trial court. That decision was affirmed by the Missouri Court of Appeals and again affirmed by the Supreme Court of Missouri. In its lead to that opinion that court said:

"This case involves three well-known principles of law:

"First and foremost is the constitutional protection of citizens from unreasonable searches and seizures by requiring the authorities to secure a search warrant based on probable cause, 'describing the place to be searched, or the person or thing to be seized * * *' Mo. Const. art. 1, § 15; U.S. Const., amend. IV '[A]ll warrantless searches, subject only to a few well delineated exceptions, are per se constitutionally offensive.' *State v. Peterson*, 525 S.W.2d 599, 603 (Mo.App. 1975).

"Second is the case law-supported rule that upon review of a trial court's order, the facts, and reasonable inferences arising therefrom, are to be stated favorably

to the order challenged on appeal. See *State v. Giffin*, 640 S.W.2d 128, 130 (Mo. 1982).

"Third is the case law-supported rule that the reviewing court is free to disregard contrary evidence and inferences, and is to affirm the trial court's ruling on a motion to suppress if the evidence is sufficient to sustain its findings. *Giffin*, supra; *State v. Baskerville*, 616 S.W.2d 839, 843 (Mo.1981); *State v. Rainbolt*, 676 S.W.2d 527, 528 (Mo.App.1984)."

About the first of these principles, there is no dispute. The majority in the instant case proceeds antithetically to the second and third principles invoked by the Supreme Court of Missouri. It is noted that the majority seeks to bootstrap its position when alluding to the irrelevant factor of the protective sweep. It says "We conclude that this finding was clearly erroneous." No evidence is alluded to, for the obvious reason that there is none, which would support that statement.

The pertinent rule in this instance is found in *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978), in which the Court said:

"We have since held that the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."

See also *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982).

The commentators have come to agree that the proper analysis is an objective not a subjective evaluation. Professor LaFave, quoted out of context by the majority, in his conclusion relating to the vitality of the doctrine of pretextual arrest following *Scott v. United States*, supra, says:

"To the extent that lower court cases of the kind now under consideration have tended, in the course of suppressing evidence on Fourth Amendment grounds, to stress the ulterior motives of the police, they may appear to run contrary to the *Scott* principle. But the inquiry in these cases into 'the underlying intent or motivation of the officers involved,' it would seem, has ordinarily been prompted by an inability of the courts to ascertain in a more direct fashion whether the police in the particular case had departed from their usual practice. This is not to suggest, however, that inquiry into motivation is either a desirable or an accurate means of resolving that issue. For one thing, there is hardly a perfect correlation between motivation and deviation. Presence of an ulterior motive may show why an officer might want to depart from the usual procedure but does not show that he has done so, and even in the absence of an ulterior motive the officer may have by inadvertence failed to conform to the usual practice. Secondly, and perhaps more important, there is no reason to believe that courts can with any degree of success determine in which instances the police had an ulterior motive. As Professor Amsterdam has quite persuasively noted:

" 'But surely the catch is not worth the trouble of the hunt when courts set out to bag the secret motivations of police in this context. A subjective purpose to do something that the applicable legal rules say there is sufficient objective cause to do can be fabricated all too easily and undetectably. Motivation is, in any event, a self-generating phenomenon: if a purpose to search for heroin can legally be accomplished only when accompanied by a purpose to search for a weapon, knowledgeable officers will seldom experience a first desire without a simultaneous onrush of the second.'

"Underlying the *Scott* rule, then, is the sound notion (expressed earlier by three members of the Court in Massachusetts v. Painten) that 'sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources.'

"What this means, then, is that the *Scott* approach of disregarding 'the underlying intent or motivation of the officers involved' is correct even in the situation which is now under discussion, *provided*

there are more reliable and feasible means of determining in a particular case whether or not the challenged arrest or search was arbitrary. This can best be accomplished by more widespread application of the requirement utilized by the Supreme Court in *South Dakota v. Opperman,* namely, that the Fourth Amendment activity 'was carried out in accordance with *standard procedures* in the local police department.' * * * " 1 W. LaFave, Search and Seizure, § 1.4(e) at 95–96 (2d ed. 1987). (Footnotes omitted; emphasis in original.)

Professor Amsterdam quoted by Professor LaFave has been a vigorous and successful advocate of constitutional rights. His acceptance of Scott is particularly noteworthy as well as his explanation for the reason the subjective pretextual search doctrine should be rejected. See *United States v. Hawkins,* 811 F.2d 210 (3d Cir. 1987). All this raises a substantial doubt that *Taglavore v. United States,* 291 F.2d 262 (9th Cir.1961), relied on by the majority still presents sound federal law.

In focusing upon the protective sweep, the majority constructs its own straw man and then proceeds to identify and reject him. The only facts material to the resolution of this case are found in the presence of the arrest warrant; the arrest of Dianne Brown; Dianne Brown's return to the inside of the trailer home after she was arrested; the fact that Corporal Murphey followed her inside; and while in a place where he was lawfully entitled to be, Corporal Murphey saw contraband in plain view. Those facts justify the findings of fact and conclusions of law made by the district court beyond legitimate question. The officers then proceeded to do what this court has often told them to do and that is obtain a search warrant. The incriminating evidence was the product of the search conducted to that warrant and was unrelated in any way, despite the suggestions of the majority opinion, to anything that was perceived during the protective sweep. In its decision from the bench, the trial court stated with respect to the protective sweep:

"And I'm also mindful of the fact that the protective sweep was limited in scope and did produce no evidence at all.

"If he had gone in and started looking through drawers, something beyond a merely protective sweep, then I think that evidence would be properly suppressable."

When this case is analyzed from an objective perspective, there is nothing present which demonstrates an unlawful search. The police officers in accordance with the rule recognized in *Washington v. Chrisman,* supra, acted lawfully in following Dianne Brown when she went back into the trailer home after being arrested pursuant to the arrest warrant. The district court correctly found that it was reasonable for the officers to do a protective sweep. Corporal Murphey was in a place where he was lawfully entitled to be when he saw the marijuana cigarette in plain view. The right to seize evidence in plain view of police officers in a place where they have a right to be has been accepted by this court. *McCutcheon v. State,* Wyo., 604 P.2d 537 (1980); *Kish v. State,* supra; *Ortega v. State,* supra. That fact then was used as the basis for obtaining a valid search warrant which was executed to unearth the evidence which led to Brown's conviction. This series of actions was carried out in accordance with standard procedures, and there is nothing in the record to refute that objective standard.

There is a suggestion of unwarranted delay in executing the arrest warrant, but according to our opinion in *Kimbley v. City of Green River,* Wyo., 663 P.2d 871 (1983), that is not a significant factor. The majority casts aspersions upon the necessity for a protective sweep in this instance, but a more valid perspective might be obtained by reading the record of the hearing and the district court's remarks. For example, in dialogue with counsel for the appellant, the district judge stated:

"THE COURT: But is that the dangerous part? Or is the dangerous part when—even if she doesn't—if she doesn't resist—when you turn her around, handcuff her, and turn your

backs and start walking towards the police car to get her put in it?

"I mean, we've had—it wasn't very long ago that two officers were shot in this community walking away from a very routine check of a dwelling. They went to a dwelling because there had been a report of an entry. They went there and found nothing and start walking back to their police car and they're opened up on.

\* \* \* \* \* \*

"THE COURT: One of them's dead, and one of them was shot."

In their zeal to free the "lady in pajamas" (according to the record Dianne Brown was wearing pajama-type clothing) from the consequences of her criminal activity and to refute the views of the dissenting justices, the majority disregards the record and proceeds upon facts of its own invention. It does seem that a reference to the medieval double-headed battleax which was strapped to the side of a motorcycle parked in the yard in front of Dianne Brown's house trailer speaks more eloquently to the situation which the officers perceived to be present. The presence of a 12-guage sawed-off shotgun in the trailer along with other firearms further justifies their perception of danger. Nevertheless, the majority opinion ridicules the concerns of these officers. Ridicule may be appropriate to some levels of debate, but that style of denigration is unbecoming to an opinion of the highest court of a state.

Furthermore, the majority opinion suggests that the protective sweep was conducted to secure the officers from the dangers posed by the "lady in pajamas," and the utter illogic of that position must be apparent to even a casual reader. While her attire probably would not be material to whether she could fire the sawed-off shotgun, they knew where she was. They were entitled to a legitimate concern about the presence of a third person other than Dianne Brown or the identified male person. I would hope that law enforcement officers will not be unduly offended by this slight of their efforts to enforce the law set forth in the majority opinion.

This search was lawful. The evidence was properly seized. Dianne Brown's conviction should be affirmed rather than reversed.

## APPENDIX A

even inquiring, total cooperation—

THE COURT: Does it come down, then, in your view—does the analysis finally sift down to a question of whether or not, based upon the totality of the facts, it appears that this search was merely, as you recall it, I think, earlier, a ruse and it was that—the purpose was to go there and figure some way to get in the house and look around—

MR. SOWADA: No. No.

THE COURT: —as opposed to protecting yourself? I don't think it comes down to that kind of an analysis.

MR. SOWADA: No. I think that civil liability comes down to that kind of analysis, and I don't think it would be justifiable in this case. That's where civil liability ought to come in.

What the question is here is that if this kind of search does occur is it violative under the circumstances and—of the Constitution of the United States—and is it the kind of thing that we ought to be protected against as citizens, not to the extent of suing the State but to the extent of being protected as a result of the exclusionary rule.

We don't have to have them—I mean, that's fraud. That's—that's illegal. We don't have to have that go to that extent to exclude this.

In addition—there's another event here that I think ought to be analyzed a little differently and I think more strictly against the State. They have to make the arrest when they can make the arrest. Now, true, there's a reason not to arrest Dianne Brown—possibly there's a reason—I don't think there is a justifiable reason in this case—but there could be a reason not to arrest Dianne Brown until a sweep was made, a protective sweep was made.

Hopefully, the parties in the mobile home, if they're dangerous people, are going to assume that the police are there for another reason, and, so, they won't take any violent measures right away. They—they—assuming—not assuming—but seeing that she's going to be arrested.

But what actually happens, as a matter of fact in this case, is they announce to her before anything happens at all that we're going to arrest you.

THE COURT: But is that the dangerous part? Or is the dangerous part when—even if she doesn't—if she doesn't resist—when you turn her around, handcuff her, and turn your backs and start walking towards the police car to get her put in it?

I mean, we've had—it wasn't very long ago that two officers were shot in this community walking away from a very routine check of a dwelling. They went to a dwelling because there had been a report of an entry. They went there and found nothing and start walking back to their police car and they're opened up on.

## APPENDIX B

WEDNESDAY, OCTOBER 30, 1985

(Whereupon, the proceedings were commenced, in chambers at 3:15 p.m. The defendant was not present.)

THE COURT: This is State v. Brown.

I've had an opportunity to do some reading on the area of search and seizure and have reached a decision in the case.

I've not had enough time to really organize my thoughts in as coherent a fashion as I'd like to, but I understand that you're both anxious to have the decision announced. So, if you'll forgive an inarticulate announcement, I can at least tell you what my decision is and the basis for it.

I am not going to suppress the evidence obtained in the search of Dianne Brown's house.

I think that the protective sweep, first of all, was justified by the totality of the circumstances in the case and point to the fact that the officer knew that the people in there were at least suspects in dealing with controlled substances, there was some reason to believe that there may be weapons in the house from the clicking that sounded like bullets being transferred to the receiver of a weapon, the knife sheath, the ax on the motorcycle. All of those things point to that.

I recognize, as the cases uphold, that a search, although reasonable at its inception, may violate the Fourth Amendment by its intensity and scope.

I don't find that that happened in this instance. The protective sweep, it seems to me, was merely that. The officer—whether he was accompanied by Mrs. Brown or not seemed to me to be immaterial. The point is that he walked very briskly through the rooms. He was apparently looking for other people and not searching for contraband or evidence of a crime.

The resulting observance by the officer of the suspected marijuana, it seems to me, was a result of his observing things which were plainly open to his view.

He got into the living room, I think, either by following Mrs. Brown in there or with her consent. In either event, it was appropriate for him to be there.

Certainly, as the Court said in *Washington v. Chrisman*, that the—it was not unreasonable for the policeman to monitor, as a matter of routine, the movements of an arrested person, as his judgment dictates. That was the instance where he followed a boy up to his dormitory room to get identification after he had picked him up for being a minor in possession and the boy went up to the room and the officer accompanied him. When he got to the room, he discovered marijuana seeds and other controlled substances.

That was originally suppressed by the—I think it was the State Appellate Court—and the United States Supreme Court upheld that as reasonable on the part of the officer.

And they also said—and I think that this is appropriate to the protective sweep, as well—that the officer's custodial authority over an arrestee doesn't depend upon a

reviewing court's after-the-fact assessment of the arrest situation.

And they were speaking there specifically about balance and whether or not the officer had a legitimate interest in protecting himself from the possible attack.

I think that's true in deciding whether or not a protective sweep is in order should be left largely to the officer's discretion, provided that there are objective factors that support that decision.

Coming back, then, I think the plain view doctrine is clearly applicable in the living room. The object was in plain view.

As the Court stated in *Coolidge v. New Hampshire*, object in plain view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant.

Clearly, I think they could have seized the roach at that time. The search was—if there was a search at all—was permissible. That, I think, also meets the test announced in *Chimal.*

I'm not unmindful of your argument, Mr. Sowada, about the policy of the exclusionary rule to serve to deter police conduct. But as it was pointed out in *Terry v. Ohio*, the exclusionary rule is powerless to deter invasions of constitutionally-guaranteed rights where the police either have no interest in prosecution or are willing to forego prosecution in the interest of serving some other goal.

And I really don't think in this instance that suppressing the evidence would serve any legitimate deterrent—would have any legitimate deterrent effect.

I think the officer's testimony was that he was going to look through that house, whether she consented or whether she didn't. Clearly, his motive, I think, was to protect himself, and he was going to do that. And whether the evidence was suppressed or not I don't think would have anything to do with whether or not he would be deterred in conducting such protective sweep in the future.

And I'm also mindful of the fact that the protective sweep was limited in scope and did produce no evidence at all.

If he had gone in and started looking through drawers, something beyond a merely protective sweep, then I think that evidence would be properly suppressable.

I just don't see any evidence that the arrestee was moved into a situation to enable the police to search. If that were the case—and this is also to your argument about arresting at the first opportunity, which I think is perhaps a more attenuated standard than that you argued. Certainly, the police cannot wait to arrest until they have an opportunity to do a search incident if that's their motive because I think clearly in this case it was not. The first time Mr. Mader went over, he was invited into the living room. The second time, they— by most accounts—they announced to her that she was arrested before they even entered the dwelling.

If they had those ulterior motives based upon her prior conduct, I think it would have been reasonable for the police to have assumed they could have gotten into her living room, and they would have tried to do that before they arrested her. And that wasn't the evidence, and I don't believe that that was their motive.

And I think, finally, you had some complaints about what—or what things were seized.

I think pretty clearly on the—pursuant to the warrant the police were searching for marijuana or any other evidence of crime that they come across in the search so long as the search was reasonably the product of the warrant and they were, in fact, looking for the material described, that is, controlled substances.

I just don't buy the argument that the police would have gone to all that effort to get a search warrant to pick up that one roach which they could have seized without a warrant at the time it was sought.

As far as the officers' presence in securing the premises for the couple hours or however long it took to get the warrant. *Seguera v. United States* was a case where the police secured a house for 19 hours while no one was there, and the Supreme Court upheld that.

In this instance, I don't know if the boyfriend was—had any legitimate claims to the premises or not. Nevertheless, all the evidence was that he appeared to live there, and the evidence that I heard indicated that there were no restrictions upon his comings or goings. In fact, he left halfway through, and he apparently had some possessory rights if not some possessory interest in the premises.

The evidence was that no searching was done, they were merely there for the purposes of making sure that no evidence or contraband was removed.

Anything else?

MR. COWAN: I have nothing, Your Honor.

MR. SOWADA: Nothing.

THE COURT: Okay. You'll prepare the order, please.

MR. COWAN: Yes, Your Honor.

(Whereupon, the proceedings were concluded at 3:25 p.m.)